**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11    IN RE CHIRON CORPORATION              No   C-04-4293 VRW
      SECURITIES LITIGATION
12                                               ORDER

13   _____/

14

15

16         "[A] bad settlement is almost always better than a good

17    trial," <u>In re Warner Communications Securities Litigation</u>, 618 F

18    Supp 735, 740 (SDNY 1985) (Keenan, J), affirmed 798 F2d 35 (2d Cir

19    1986).  But a good epigram could, in this case at least, make for a

      bad result.
20

21         Four features of the class action settlement at bar make

22    the point and lead the court to deny preliminary approval of the

23    settlement: (1) the settlement proposes to pay class counsel fees

24    that, for the amount of time worked, are eight to ten times typical

25    hourly attorney fees; (2) the proposed notice omits a material term

26    of the settlement; (3) facts in the record or subject to judicial

27    notice raise question whether lead plaintiff can "fairly and

28    adequately protect the interests of the class"; and (4) a web of

relationships on both sides of this case, and in particular that between defendants' counsel and one of class counsel's former partners, raises concerns about the adequacy of the disclosures in the proposed class notice and even a concern about the possibility of an appearance of impropriety.

The case stems from the highly publicized events surrounding the United States influenza ("flu") vaccine shortage in 2004.  Plaintiffs seek recovery for violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 on behalf of a class of purchasers of Chiron Corporation stock between July 23, 2003 through October 5, 2004, inclusive, on grounds that defendants misrepresented and failed to disclose adverse facts concerning Chiron's ability to produce the Fluvirin influenza virus vaccine for the United States market.

Twelve different law firms appeared on behalf of the various plaintiffs in the six cases that form this litigation.[1]  Of the various plaintiffs in these actions, only two appear to have sought to serve as lead plaintiff and appoint lead counsel pursuant to 15 USC § 78u-4(a)(3): (1) International Union of Operating Engineers Local No 825 Pension Fund sought to appoint Milberg Weiss Bershad & Shulman, LLP (counsel originally filing the <u>Nach</u> case) and (2) Pipefitters Locals 522 and 633 Pension Trust Fund sought to appoint Lerach Coughlin Stoia Geller Rudman & Robbins, LLP (counsel originally filing the <u>Gregory</u> case).  Five months prior to the commencement of this litigation, the Lerach firm split from Milberg

_____

[1]<u>Gregory v Chiron Corp</u>, 04-4293; <u>Nach v Chiron Corp</u>, 04-4346; <u>Kramer v Chiron Corp</u>, 04-4416; <u>Jaroslawicz v Bryson</u>, 04-4474; <u>Judith Fisher v Chiron Corp</u>, 04-5137; and <u>Jerome Fisher v Chiron Corp</u>, 05-0246.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Weiss.  On February 4, 2005, counsel in <u>Jaroslawicz</u> sought to

2    dismiss that action.  Then, on February 24, 2005, Pipefitters

3    Locals 522 and 633 Pension Trust Fund withdrew its application to

4    serve as lead plaintiff, leaving only the Local 825 fund's

5    application, which was granted on March 23, 2005.  The appointment

6    of the lead plaintiff and its selection of Milberg Weiss as lead

7    counsel were thus made without open competition and <u>Gregory</u>,

8    although initiated by the Lerach firm, became the lead case,

9    presumably because it was the first filed action.

10            The amended consolidated complaint, Doc #50, followed on

11   April 14, 2005.  About five weeks or so after the amended

12   consolidated complaint, on May 26, 2005, Chiron and the individual

13   defendants separately filed motions to dismiss the complaint.  Doc

14   ##57, 60.  The motions to dismiss were heard on June 29, 2005.  At

15   the hearing, the court expressed concern about the clarity of the

16   factual theory plaintiff had alleged in the consolidated amended

17   complaint.  See Doc #82, Hrg Tr, June 29, 2005, at 63-64.  After

18   some discussion, plaintiffs' counsel agreed to file either a

19   supplemental brief explaining the allegations of the existing

20   pleading or alternatively a further amended consolidated complaint.

21   See Doc #82, Hrg Tr, June 29, 2005, at 67-72.  On July 29,

22   plaintiff filed a supplemental brief, Doc #84, to which defendants

23   responded on August 19, 2005.  Doc #90.

24            While the motions were pending the parties entered into

25   settlement discussions and executed a settlement understanding on

26   June 6, 2006.  Doc #103, ¶19 at 5-6.  In the meantime, in February

27   2006, the SEC informed Chiron that it was terminating its

28   investigation of Chiron with respect to potential violations of

United States District Court
For the Northern District of California

federal securities laws.  Doc #103, ¶22.  In addition, although investigations of Chiron had been announced by the United States Attorney's Office for the Southern District of New York and the United States House of Representatives, Energy and Commerce Committee, Subcommittee on Oversight and Investigations, neither entity took any action against Chiron.  Doc #103, ¶22.

On April 19, 2006, Chiron's shareholders approved a merger with Novartis AG.  Doc #103, ¶23.  Novartis owned 42% of Chiron prior to executing the merger agreement.  Doc #103, ¶23.  As a result of the merger, Chiron became an indirect wholly owned subsidiary of Novartis, and Chiron's common stock ceased trading on NASDAQ.  Doc #103, ¶23.

As a result of the provisions of 15 USC § 78u-4(b)(3)(B) and the early settlement discussions conducted by counsel, it appears that little, if any, discovery was conducted into the merits of plaintiffs' allegations.  The litigation thus appears to have proceeded almost directly from pleading to settlement with no ruling on the pleading or merits discovery.  The final terms of the stipulated settlement were not agreed to until March 29, 2007.  The proposed settlement provides that defendants will pay $30 million in cash plus an amount equivalent to interest at the thirty-day Treasury Bill rate from June 6, 2006 to the date of payment.  Doc #100, ¶4.  The settlement amount will be paid into a common fund to be distributed to class members.  Doc #100, ¶¶9-11.

\\

\\

\\

\\

**4**

I

A

The allegations of the amended consolidated complaint, briefly summarized here, concern defendants' statements and alleged misstatements about Fluvirin, an injectable flu vaccine whose distribution in the United States is licensed by the Food and Drug Administration (FDA), following FDA bi-annual inspections and subject to "good manufacturing practices" (GMP) regulations. Because the manufacturing facility involved in this case was located in Liverpool, England (the "Liverpool plant"), it was also subject to oversight by the Medicines and Healthcare Products Regulatory Agency (MHRA), the British counterpart to the FDA. Doc #50, ¶¶49, 50.

Until January 2000, the Liverpool plant was owned and operated by Medeva Pharma Ltd. An FDA inspection of the Liverpool plant in July 1999 uncovered unusually high levels of bacteria and other microorganisms known as "bioburden" in batches of Fluvirin, as well as other evidence of failure to comply with GMP and other requirements. This prompted a warning letter from the FDA threatening to suspend or revoke Medeva's license if adequate corrective measures were not taken. Id ¶¶54, 55. The Liverpool plant then became something of a hot potato, acquired by Celltech Chiroscience in January 2000 only to be resold to England-based PowderJect Pharmaceuticals in October 2000. Doc #50, ¶¶56, 58.

On March 9, 2001, FDA inspectors visited the Liverpool plant and once again found the production of Fluvirin to be deficient in several respects. At the conclusion of the inspection, the FDA issued a Form FDA 483 noting "significant

United States District Court

For the Northern District of California

objectionable conditions." Doc #50, ¶58.  In June 2003, the FDA conducted another inspection of the Liverpool plant.  Once again, inspectors discovered pervasive quality-control problems and symptoms thereof, including (1) "potentially lethal bacteria" after "ultrafiltration" and "sterile filtration," points in the process by which all bacteria should have been eliminated, (2) poor sanitation practices, including improper maintenance of "curtains" separating sterile areas from non-sterile areas and (3) a susceptibility to contamination in the aseptic connections between tanks of vaccine in the "formulation area" of the plant.  Doc #50, ¶¶72-73.  As in 2001, the FDA inspectors issued a Form FDA 483 and, according to the CAC, although the inspectors initially recommended that official enforcement action be taken due to the "pervasiveness and severity" of the GMP deficiencies at the Liverpool plant, this recommendation was later downgraded to a request that PowderJect take voluntary corrective action.  Doc #50, ¶¶78-79.

       Enter Chiron.  On July 8, 2003, Chiron acquired PowderJect (and the Liverpool plant) for $878 million, giving Chiron immediate access to the lucrative flu vaccine market in the United States.  Doc #50, ¶¶43, 45.  In 2003, Chiron realized $219 million in revenues from the sale of 40 million Fluvirin doses worldwide.

       In October 2003, Chiron began publicly forecasting that (1) it would top its 2003 Fluvirin production by manufacturing approximately 50 million Fluvirin doses for the 2004-2005 flu season and (2) its 2004 pro forma earnings per share (EPS) would be in the range of $1.80-$1.90.  CAC ¶¶119-141.  With some minor alterations, these representations continued well into 2004.

On August 26, 2004, Chiron announced that it would delay shipments of Fluvirin pending additional testing, after internal tests identified a small number of lots with sterility problems. Doc #100, Ex A-1 at 7.  Chiron announced that the additional testing would delay the Fluvirin shipment until early October and would prevent the company from recognizing revenue from Fluvirin in the third quarter of 2004.  Doc #119 at 7.  Following the announcement, Chiron's stock price declined from $47.49 per share on August 26, 2004 to $43.41 per share on August 27, 2004.  Doc #119 at 7.

On October 5, 2004 Chiron issued a press release announcing that the MHRA

> has asserted that Chiron's manufacturing process does not comply with UK Good Manufacturing Practices regulations and has suspended [Chiron's] Liverpool facility license to manufacture influenza vaccine for three months. * * *  As a result of the license suspension, Chiron does not expect to record any sales of Fluvirin for the 2004-2005 season.  Chiron disaffirms its previous full-year 2004 pro-forma earnings guidance of $1.80-$1.90 per share (a range of $1.50-$1.60 per share on a GAAP basis), including its August 2004 guidance of being in the low end of this range.

Doc #50, ¶142.
In essence, MHRA concluded that the manufacturing process at the Liverpool plant did not conform to accepted manufacturing practices and had consequently produced a notable number of contaminated Fluvirin doses.  MHRA's Inspection Action Group concluded that it would simply be too risky to allow Chiron to release potentially contaminated vaccines and thus MHRA suspended Chiron's license. Following the announcement, Chiron's trading stock price dropped \\

7

from $45.42/share to close at $37.98/share, a one-day drop of 16.3%.  Doc #50, ¶142.  A week later, this litigation commenced.

Plaintiffs contend that Chiron's projections regarding its (1) expectation to ship approximately 50 million Fluvirin doses worldwide and (2) 2004 pro-forma EPS of $1.80-$1.90 were false and misleading when made because Chiron omitted material information known to it at the time of the statements, regarding manufacturing deficiencies at the Liverpool plant.  Based on these allegations, plaintiffs sought relief against Chiron, Pien (former Chiron CEO), Smith (former Chiron CFO) and Lambert (former President of Chiron Vaccines).

<center>B</center>

Federal Rule of Civil Procedure 23(e) requires court approval for the settlement of any class action.  In order to be approved, a settlement must be "fundamentally fair, adequate and reasonable."  <u>Torrisi v Tucson Elec Power Co</u>, 8 F3d 1370, 1375 (9th Cir 1993) (quoting <u>Class Plaintiffs v Seattle</u>, 955 F2d 1268, 1276 (9th Cir 1992), cert denied, 506 US 953 (1992)), cert denied, 512 US 1220 (1994).  At least four features of this settlement appear to fail that test and indeed suggest that the settlement was negotiated under questionable circumstances.  A discussion of these features follows.

\\

\\

\\

\\

\\

\\

<center>8</center>

**United States District Court**
For the Northern District of California

1

2

## II

## A

3    Class counsel seek $7,500,000 (25% of the settlement

4 fund) in fees.  Doc #102 at 16-24.

5    "Attorneys' fees provisions included in proposed class

6 action settlement agreements are, like every other aspect of such

7 agreements, subject to the determination whether the settlement is

8 'fundamentally fair, adequate, and reasonable.'"  <u>Staton v Boeing</u>

9 <u>Co</u>, 327 F3d 938, 963 (9th Cir 2003), quoting FRCP 23(e).  The court

10 is obligated to conduct an independent inquiry into the

11 reasonableness of any attorney fee provisions of a class action

12 settlement even in the face of an agreement between the parties

13 regarding the payment and amount of attorney fees and costs.

14    Common fund cases create a situation in which normal

15 reliance on the adversary process to police the appropriateness of

16 a fee award is unavailing.  <u>Report of the Third Circuit Task Force,</u>

17 <u>Court Awarded Attorney Fees</u> (<u>Task Force Report</u>), 108 FRD 237, 251

18 (3rd Cir 1985).  The prospect of a sizeable attorney fee award can

19 drive a wedge between the class and class counsel, the former

20 interested in the largest settlement obtainable for the class and

21 the latter in the largest fee award obtainable.  Unsurprisingly, a

22 class action defendant has little or no incentive to contest the

23 amount allocated to attorney fees in a proposed settlement,

24 provided the total amount of the settlement is acceptable.  "Since

25 the defendant is interested only in the total size of its

26 liability, so long as the settlement is accepted, it will often be

27 indifferent as to the division of the fund between the plaintiffs'

28 recovery and the attorneys' fees."  <u>Task Force Report</u> at 266.

United States District Court
For the Northern District of California

1   "[T]o avoid abdicating its responsibility to review the

2   agreement for the protection of the class, the Ninth Circuit

3   requires that a district court must carefully assess the

4   reasonableness of a fee amount spelled out in a class action

5   settlement agreement." Staton, 327 F3d at 963 (citing Piambino v

6   Bailey, 610 F2d 1306, 1328 (5th Cir 1980); Strong v BellSouth

7   Telecomms, 137 F3d 844, 848-50 (5th Cir 1998); Jones v Amalgamated

8   Warbasse Houses, Inc, 721 F2d 881, 884 (2nd Cir 1983)).  This

9   obligation is especially strong if the fee award appears high.

10          [If] the amount of fees [a defendant] agreed to pay in
            the settlement agreement [is] distinctly higher than the
11          fees class counsel could have been awarded by the
            district court using the lodestar method, the court would
12          almost surely [have] to find the fees unreasonable.
            Absent some unusual explanation, a defendant would not
13          agree in a class action settlement to pay out of its own
            pocket fees measurably higher than it could conceivably
14          have to pay were the fee amount litigated, unless there
            was some non-fee benefit the defendant received thereby.
15
16   Staton, 327 F3d at 966.

17          This settlement illustrates that looking only at the

18   percentage of the common fund sought as fees is insufficient.  The

19   Ninth Circuit has noted that a fee of "25 percent has been a proper

20   benchmark figure, which [the district court] can then adjust upward

21   or downward to fit the individual circumstances" of the case.

22   Paul, Johnson, Altom & Hunt v Graulty, 886 F2d 268, 273 (9th Cir

23   1989).  The "individual circumstances" warranting this adjustment

24   have been described in a variety of ways, most of them highly

25   subjective and not very illuminating.  See the twelve criteria

26   outlined in Kerr v Screen Extras Guild, 526 F2d 67, 70 (9th Cir

27   1975); Johnson v Georgia Highway Express, Inc, 488 F2d 714, 717-19

28   (5th Cir 1974).  If "[r]easonableness is the goal, and mechanical

United States District Court

For the Northern District of California

or formulaic application * * * where it yields an unreasonable result, can be an abuse of discretion," In re Coordinated Pretrial Proceedings, 109 F3d 602, 607 (9th Cir 1997), a percentage-only test here would strain the limits of discretion.  For although a 25 percent fee seems to fall in line with other class action fee awards, see Theodore Eisenberg and Geoffrey P Miller, Attorneys Fees in Class Action Settlements: An Empirical Study, 1 J Empirical Legal Stud 27 (2004), an assessment of the percentage of the common fund claimed by class counsel does not tell the full story.  As Judge Sneed noted, "[l]odestar calculations may be required under circumstances in which a percentage recovery would be either too small or too large in light of the hours devoted to the case."  Six (6) Mexican Workers v Arizona Citrus Growers, 904 F2d 1301, 1312 (9th Cir 1990) (concurring).

        The circumstances at bar demonstrate vividly the wisdom of Judge Sneed's observation and why the court "rejects reliance solely on a comparison of the percentage fee requested here with other percentage awards or with a so-called benchmark percentage." In re HPL Technologies, Inc Sec Litig, 366 F Supp 2d 912, 914 (ND Cal 2005); See also Vaughn R Walker & Ben Horwich, The Ethical Imperative of a Lodestar Cross-Check:  Judicial Misgivings about "Reasonable Percentage" Fees in Common Fund Cases, 18 Georgetown J Legal Ethics 1453 (2005).  A lodestar cross-check poses serious doubt about the reasonableness of the present fee request.  After submission of the proposed settlement, and only as a result of the court's request, class counsel conducted a lodestar cross-check, that is a submission of the hours worked on the case by various attorneys and paralegals multiplied by their "respective billing

United States District Court

For the Northern District of California

rates."  Doc #121, Ex 1 (Decl Jeff S Westerman).  This produced a lodestar fee claim of $1,126,338.50.  See Doc #121, Exs 1-4.  But included in this claim was $227,209.25 for so-called "professional support staff," including investigators, library service, economic analysts and others.  While at least some of these costs may be attorney/paralegal overhead, attorney and paralegal overhead costs are compensated through the attorney and paralegal hourly charges. Costs such as those included in class counsel's "support staff" costs are more properly treated as reimbursable expenses.

The vice of including "support staff" costs in a claim for attorney fees is quite simple.  The latter are subject to the possibility of a multiplier whereas the reimbursable expenses are not.  To the extent that an out-of-pocket expense is characterized as compensation for attorney effort, and multiplied, the class is overcharged to the extent of any multiplier the court chooses to award.  Looking then only at class counsel's claim for attorney fees, class counsel's attorney/paralegal lodestar amounts to $899,129.25 and a 25 percent fee, $7,500,000 here, results in an implied multiplier of 8.34.

But even this understates the magnitude of class counsel's fee request.  Just as a fee claim can be padded by including under its rubric what are more properly reimbursable expenses, the multiplier itself can be understated by use of overly generous attorney/paralegal hourly rates.  While the court is not unaware of published reports of eye-popping hourly attorney rates (See Nathan Koppel, Lawyers Gear Up Grand New Fees, Wall St J, B1 (Aug 22, 2007)), anecdotal evidence of this kind is plainly unreliable for purposes of court ordered fee awards.  In their

1  submission in response to the court's request for lodestar data,

2  class counsel submitted "sample billing rates" obtained from a

3  website that collects rates for attorney fee requests filed in

4  bankruptcy courts, Doc #127 Exs 5-6, and some sample rates for

5  attorneys of various years of experience.  Doc #127, Ex 7.  Counsel

6  failed to make a case that these rates were truly representative

7  and, still less, systematically compiled.  And differences in

8  hourly rates can make a big difference in the multiplier.

9       A widely recognized compilation of attorney and paralegal

10  rate data is the so-called Laffey matrix, so named because of the

11  case that generated the index.  In Laffey v Northwest Airlines,

12  Inc, 572 F Supp 354 (DDC 1983), aff'd in part, rev'd in part on

13  other grounds, 746 F2d 4 (DC Cir 1984), the court employed a

14  variety of hourly billing rates to account for the various

15  attorneys' different levels of experience.  The Laffey matrix has

16  been regularly prepared and updated by the Civil Division of the

17  United States Attorney's Office for the District of Columbia and

18  used in fee shifting cases, among others.[2]  The Laffey matrix is

19  especially useful when the work to be evaluated consists of that by

20  a mix of senior, junior and mid-level attorneys, as well as

21  paralegals.

22       Under the 2007 Laffey matrix, attorneys bill at the

23  following rates according to experience:

24

25

26       [2]

27  http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix

28  _7.html, visited October 1, 2007.

| Experience | Rate Per Hour |
|---|---|
| 20+ Years | $440 |
| 11-19 Years | $390 |
| 8-10 Years | $315 |
| 4-7 Years | $255 |
| 1-3 Years | $215 |
| Paralegals & Law Clerks | $125 |

These figures are, however, tailored for the District of Columbia, which has a lower cost of living than New York and Los Angeles (the cities in which class counsel operates).  Accordingly, some adjustment appears appropriate here.  To make the adjustment, the court will use the federal locality pay differentials based on federally compiled cost of living data.  See http://www.opm.gov/oca/07tables/indexGS.asp; In re HPL, 366 F Supp 2d at 921 (adjusting locality pay differentials based on the geographical region in which lead counsel's firm operated).  A review of the pay tables shows the Washington-Baltimore area has a +18.59% locality pay differential; the New York area has a +24.57% locality pay differential; and the Los Angeles area has a +24.03% locality pay differential.  Adjusting the Laffey matrix figures accordingly will yield appropriate rates for the respective geographical regions: +5% for New York and +4.6% for Los Angeles.

Applying these adjustments the court obtains the following rates:

\\

\\

\\

14

| <u>Experience</u> | New York Rate Per Hour (+5% Adjustment) | Los Angeles Rate Per Hour (+4.6% Adjustment) |
|---|---|---|
| 20+ Years | 462.00 | 460.24 |
| 11-19 Years | 409.50 | 407.94 |
| 8-10 Years | 330.75 | 329.49 |
| 4-7 Years | 267.75 | 266.73 |
| 1-3 Years | 225.75 | 224.89 |
| Paralegals & Law Clerks | 131.25 | 130.75 |

The following table reflects the court's adjusted lodestar calculations for attorneys and paralegals working on the case:

| <u>Attorney/ Paralegal</u> | <u>Location</u> | <u>Years Experience</u> | <u>2007 Laffey Rate</u> | <u>Total Hours</u> | <u>Total Lodestar</u> |
|---|---|---|---|---|---|
| Bauer, G | NY | 27 | 462.00 | 91.25 | $42,157.50 |
| Bershad, D | NY | 42 | 462.00 | 1.25 | $577.50 |
| Graziano, S | NY | 15 | 409.50 | 7.5 | $3,071.25 |
| Kartapoulos, A | NY | 25 | 462.00 | 177.25 | $81,889.5 |
| Kusel, E | NY | 12 | 409.50 | 72.25 | $29,586.38 |
| Rogers, K | LA | 11 | 407.94 | 6.5 | $2,651.61 |
| Schulman, S | NY | 26 | 462.00 | 2.75 | $1,270.50 |
| Seidman, P | NY | 12 | 409.50 | 66.75 | $27,334.13 |
| Weiss, M | NY | 47 | 462.00 | 31.4 | $14,506.80 |
| Westerman, J | NY | 27 | 460.24 | 211.75 | $97,455.84 |
| Andrejkovis, P | NY | 11 | 409.50 | 1.00 | $409.50 |
| Furukawa, M | LA | 3 | 224.89 | 20.00 | $4,497.80 |
| Lin, E | LA | 13 | 407.94 | 755.25 | $308,096.69 |

15

**United States District Court**
For the Northern District of California

| | | | | | |
|---|---|---|---|---|---|
| Lipton, A | NY | 6 | 267.75 | 0.25 | $66.94 |
| Long, B | DE | 9 | 313.43 | 0.75 | $235.07 |
| McCulloch, K | LA | 12 | 407.94 | 24.3 | $9,912.94 |
| Mills, J | NY | 4 | 267.75 | 2.5 | $669.38 |
| Quinn, MJ | NY | 15 | 409.50 | 0.25 | $102.38 |
| Rado, A | NY | 7 | 267.75 | 75.5 | $20,215.13 |
| Chowdhury, I | LA | 9 | 329.49 | 9.25 | $3047.78 |
| Kroll, A | NJ | 33 | 200.00 | 4.6 | $920.00 |
| Giblin, V | NJ | 11 | 175.00 | 30.5 | $5,337.50 |
| Finnell, L | NJ | 3 | 135.00 | 0.1 | $13.50 |
| Glancy, L | LA | 19 | 407.94 | 0.75 | $305.96 |
| Goldberg, M | LA | 11 | 407.94 | 12.0 | $4,895.28 |
| MacDiarmid, D | LA | 4 | 266.73 | 1.2 | $320.08 |
| Murray, B | NY | 17 | 409.50 | 8.0 | $3,276.00 |
| Belfi, E | NY | 11 | 409.50 | 8.5 | $3,480.75 |
| Donders, L | NY | 5 | 267.75 | 1.0 | $267.75 |
| Hinton, C | NY | 4 | 267.75 | 0.5 | $133.88 |
| Patton, A | NY | 4 | 267.75 | 1.6 | $428.40 |
| Summer Clerks | NY | – | 131.25 | 6.25 | $820.31 |
| Paralegals (LA) | | – | 130.75 | 11.2 | $1,464.40 |
| Paralegals (NY) | | – | 131.25 | 370.35 | $48,608.44 |
| Paralegals (NJ) | | – | 70.00 | 3.0 | $210.00 |
| | | | Totals | | |
| | | | | 2017.25 | $718,236.81 |

16

**United States District Court**

For the Northern District of California

1       This table reflects the following: only categories
2  covered by the <u>Laffey</u> matrix are included; consolidated paralegal
3  work is based on geographical region; New York rates are used for
4  lead counsel summer clerks and paralegals; requested rates below
5  <u>Laffey</u> matrix rates are unadjusted; and Mr Long's billing rate
6  reflects a downward adjustment for Delaware.

7       The court now turns to the lodestar cross-check, which
8  entails evaluation of the multiplier implied by lead counsel's
9  requested fee (25% percent of a $30 million settlement, or $7.5
10 million) and lead counsel's lodestar fee (computed above as
11 $718,236.81).  The lodestar calculation under the <u>Laffey</u>
12 methodology results in a multiplier of 10.44.

13      Either the 8.34 or the 10.44 multiplier far exceeds the
14 multipliers the court has, in its experience, encountered and
15 observed in other common fund securities class actions.  In almost
16 every scenario, the multiplier is greater than one and often in the
17 order of two to four.  See, e g, <u>Van Vranken v Atlantic Richfield</u>
18 <u>Corp</u>, 901 F Supp 294, 298 (ND Cal 1995) ("Multipliers in the 3-4
19 range are common in lodestar awards for lengthy and complex class
20 action litigation."); <u>Behrens v Wometco Enterprises, Inc</u>, 118 FRD
21 534, 549 (SD Fla 1988) ("[The] range of lodestar multiples in large
22 complicated class actions [varies from] a low of 2.26 to a high of
23 4.5.").  These judicial observations are borne out in a more
24 systematic study of common fund class action fee awards compiled a
25 few years ago.  Beverly C Moore, et al, 24 Class Action Reports, no
26 2 (March-April 2003).  This study included 877 securities class
27 actions, 391 of which reported multiplier data.  Of these 391
28 cases, 353 involved class recoveries of $50 million or less.  The

multipliers observed in these cases charted against the amounts of recovery are displayed in the following chart:

**Multiplier v Class Recovery $50 Million or Less**



Linear and non-linear regressions show the multiplier in these cases to fall in the range of 0.5 to 3.0.  This chart shows that negative multipliers – those below 1.0 – are more common than the court previously perceived.  See Doc #190 in 03-5138 VRW (<u>In re Portal Software, Inc Sec Litig</u>).  This chart also shows that courts make some effort to provide incentives for greater recovery.  For purposes of this case, however, this study demonstrates that, as compared to other common fund securities class action, the multiplier implied by class counsel's fee request is patently unreasonable.

\\

**United States District Court**
For the Northern District of California

Note further that the difference between class counsel's claimed lodestar and the lodestar produced using the <u>Laffey</u> matrix is $180,892.44.  Hence, although the claimed hourly rates of some attorneys in class counsel's firm are substantially more than <u>Laffey</u> rates (e g, class counsel's most senior lawyer's claimed hourly rate of $925 versus an adjusted <u>Laffey</u> rate for an attorney of 20+ years of experience of $462), the <u>Laffey</u> matrix generates a total fee over all attorneys that is approximately 80 percent of class counsel's claimed rates.  As class counsel's claimed rates undoubtedly include some amount to compensate for the risk of non-collection – class counsel work on a contingency basis, after all – while the <u>Laffey</u> rates are fees actually paid, the <u>Laffey</u> matrix cannot be criticized as representing bargain basement attorney fees.  But relatively small differences in rates can be blown out of proportion by the multiplier.  For example, class counsel's most senior lawyer billed 31.4 hours to the litigation, which at his claimed hourly rate represents 3.2 percent of class counsel's lodestar.  On the assumption that this lawyer's work contributed that percentage of the value of class counsel's services, a 25 percent fee award would compensate this lawyer's work at over $7,715 per hour.

The court harbors no doubt that a multiplier of some kind should apply in this litigation for any recovery obtained by class counsel.  The action was prosecuted on a contingency basis. Class counsel confronted a risk of non-recovery.  But that risk puts an outer limit on the multiplier, e g, a 50 percent chance of recovery implies a multiplier of 2, a 25 percent chance of recovery implies a multiplier of 4 and so on.  The multipliers sought here

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  imply a chance of recovery of 1 out of 8 or 1 out of 10.  To be

2  sure, able class action lawyers do not need to show that they lose

3  7 out of every 8 cases to justify an eight multiplier.  Careful

4  case selection cuts down these odds and should not be penalized.

5  But class counsel's efforts should not be rewarded with undue

6  lavishness.  The point is simply this: class counsel need to

7  justify both the application of a multiplier and its level as much

8  as they need to show that their hourly rates are in line with

9  competitive norms.  Class counsel here have failed to do so.

10          The court recognizes that the Seventh Circuit takes a

11  somewhat different approach than the Ninth Circuit to assessing the

12  reasonableness of class counsel fees.  The former circuit takes a

13  somewhat more prospective or ex ante approach.  See In re Synthroid

14  Mktg Litig, 264 F3d 712 (7th Cir 2001); where attorney fees are not

15  determined up front in a case (and they usually are not), the

16  Seventh Circuit instructs that the district court "undertake an

17  analysis of the terms to which the private plaintiffs and their

18  attorneys would have contracted at the outset of the litigation

19  when the risk of loss still existed."  Sutton v Bernard, – F3d –,

20  2007 WL 2963940 (7th Cir 2007).

21          Because a prospective fee negotiation occurs without the

22  plaintiffs and the attorneys knowing what the recovery will be, if

23  any, and how much of the attorney's time and expense will be needed

24  to produce a recovery, the Seventh Circuit's approach is likely to

25  take the form of a percentage approach.  But this by no means

26  suggests that a lodestar cross-check is inappropriate or

27  unnecessary.  Indeed, a lodestar cross-check is extremely useful in

28  that context, because a reasonable percentage fee is not

United States District Court
For the Northern District of California

necessarily a flat or straight percentage.  A prudent plaintiff
negotiating in advance of litigation with contingent fee counsel
should take account of the economies of scale inherent in large
recoveries and require that counsel share those economies by
demanding a sliding scale percentage.  A lodestar cross-check can,
therefore, assist a court attempting to find the reasonable
percentage no less than the court attempting to find reasonable
hourly compensation.

                                    B

          Paragraph 28(b) of the Stipulation and Agreement of
Settlement, Doc #100, permits defendants to terminate the
settlement "in the event that valid and timely requests for
exclusion are received which exceed the amount set forth in the
Memorandum of Understanding dated June 6, 2006."  Doc #100, ¶28(b).
At the August 2, 2007 hearing, counsel provided the court with a
copy of a "supplemental agreement" showing the number of shares of
Chiron common stock that- if held by opt-outs- would trigger
defendants' right to terminate the settlement.  Counsel requested
leave to file the supplemental agreement under seal and to issue a
class notice that excluded any reference to the said number of
shares, which they referred to as "the magic number."

          Counsel for both sides argue that the purpose of keeping
the "magic number" from class members is to ensure that class
members decide whether to request exclusion based on the merits of
the settlement, not their ability to leverage themselves into a
better deal.  Defendants' counsel put it this way: "[L]et's say a
group of shareholders were to get together and decide 'Let's try
and collect as many people as we can to try and opt out just to see

                                   21

United States District Court
For the Northern District of California

1   if we can leverage a better position and get a better deal.'"   See

2   Hrg Tr, Aug 2, 2007, at 16.   But counsel failed to explain how the

3   number is separate from the settlement and its merits.   The

4   memorandum of understanding between counsel and the merits of the

5   settlement agreement are not so easily distinguished because class

6   counsel represents the class or, at any rate, are supposed to do

7   so.   Moreover, the "magic number" necessarily speaks to defendants'

8   views of the settlement as that is the only explanation for

9   defendants' reservation of termination rights.   Specifically, the

10  "magic number" provides defendants with an opportunity to determine

11  the potential number of claims that may remain unresolved before

12  proceeding with the settlement.   The number may also suggest

13  defendants' belief that if enough people opt out, defense counsel

14  should have a chance to defend the case more vigorously.

15       There's another aspect of not disclosing the "magic

16  number" that the court finds troubling.   Class counsel's comments

17  in support of non-disclosure hinted at the problem: "[T]here's

18  generally been a concern that a shareholder with the magic number

19  [of shares] or near the magic number, if such a shareholder exists,

20  could try to use that as leverage for personal gain as opposed to a

21  benefit for the class."   See Hrg Tr, Aug 2, 2007, at 18-19.   The

22  point class counsel seemed to be making although obviously not

23  putting it in those terms is that the interests of the class are

24  not entirely congruent.   A shareholder with the "magic number" of

25  shares might well have interests different from other shareholders.

26  It is by no means unheard of in corporate affairs that the number

27  of shares matters.   Assuming arguendo some incongruity in the

28  interests of the class based on how close to the magic number a

United States District Court

For the Northern District of California

class member's shares come, the court is hard-pressed to discern why that shareholder should not be told that he has the leverage to skuttle the settlement.  In sum, the number reflects the parties' bargained-for expectations and, as a consequence, is part and parcel of the merits of the settlement.

Frustrating the settlement is exactly what class members are entitled to do, if they think the settlement is not fair.  The class' "frustration rights" should not themselves be frustrated.  Counsel's fears of the extortion value to the class in disclosing the "magic number" may well be unfounded.  Counsel offered the court no reason to believe that these events were real possibilities.  Moreover, if they are real possibilities, this likely says something about the merits of the settlement.  If enough class members find it desirable to torpedo the settlement or force its renegotiation, the settlement is likely not in the best interests of the class.

Keeping the class in the dark about the "magic number" hints at something darker still.  "The danger of collusive settlements * * * makes it imperative that the district judge conduct a careful inquiry into the fairness of a settlement to the class members."  <u>Mars Steel Corp v Continental Illinois Nat Bank and Trust Co of Chicago</u>, 834 F2d 677, 681-82 (7th Cir 1987) (Posner).  And the court should be party to nothing that fails fully to inform the class of the settlement terms.

C

The third aspect of this settlement that leads the court to suspect that its approval may not be in the best interests of the class is the questionable adequacy of lead plaintiff and

23

United States District Court

For the Northern District of California

purported class representative, Local 825.  "Fair and adequate"
representation requires that the class representative be both
willing and able to monitor closely the conduct of class counsel
during settlement negotiations.  The great risk of settlements such
as the one currently before the court is that the settlement terms
will serve more the interests of class counsel than the needs of
class members.  This risk arises because "[s]hareholders with well-
diversified portfolios or small holdings lack the incentive and
information to police settlements-the cost of policing typically
outweigh any pro rata benefits to the shareholder."  Bell Atlantic
Corp v Bolger, 2 F3d 1304, 1309 (3d Cir 1993).

          Christine Medich, the Administrator of Local 825,
submitted a declaration in support of the motion for preliminary
settlement approval.  Doc #104.  Therein, Ms Medich states that she
has been "intimately involved with this litigation since its
filing."  Doc #104, ¶4.  Ms Medich states that she was "personally
involved with the settlement negotiations" and "was present at all
face to face negotiations which took place in this matter, and in
several break-out sessions."  Doc #104, ¶5.  Ms Medich also
approved of a fee range of 25 to 40 percent at the time of
retention of counsel and states that she endorses counsel's current
25 percent fee request.  Doc #104, ¶7.  In light of the above
discussion on the excessiveness of a 25 percent fee award, it does
not appear that Ms Medich has made an effort to maximize the net
recovery of absent class members.  Nor does it appear that Ms
Medich negotiated a fee agreement in a way that reflects the market
value of lawyer services.  Rather, lead plaintiff's involvement
\\

24

United States District Court
For the Northern District of California

seems to have been confined to an endorsement of lead counsel's proposed fee.

Ms Medich also states that:

> In addition to this action, [Local 825] has served as Lead Plaintiff in other securities litigations, including <u>In re Diebold Sec Litig</u>, No 05-2873 (ND Ohio), filed December 13, 2005, <u>In re Freescale Semiconductor, Inc Shareholder Lawsuit</u> (Travis County, Texas), filed October 13, 2006, and <u>Operating Engineers Local 825 Pension Fund v Aeroflex, Inc</u>, No 07-004181 (Sup Ct Nassau County, 2007).

Doc #104 ¶3.  The court's research shows that lead counsel here is also lead counsel in all three of these cases.

The court's research also uncovered seven other federal securities/stockholder class actions in which the International Union of Operating Engineers is listed as a plaintiff:  <u>Garber, et al v Pharmacia Corp, et al</u>, No 03-1519 (DNJ), <u>City of Roseville et al v Micron Technology, Inc et al</u>, No 06-0085 (D Idaho), <u>Faverman et al v Doral Financial Corp et al</u>, No 05-4026 (SDNY), <u>Shankar v Boston Scientific Corporation et al</u>, No 05-11934 (D Mass), <u>In Re: Doral Financial Corp Securities Litigation</u>, No 05-1706 (SDNY), <u>Citizens for Consume, et al v Abbott Laboratories, et al</u>, No 01-12257 (D Mass), <u>Weiss v Friedman, Billings, Ramsey Group, Inc et al</u>, No 05-4617 (SDNY), <u>Nugent, et al v AFC Enterprises, Inc, et al</u>, No 03-0817 (ND Ga).

Local 825 is listed as a plaintiff, though not lead plaintiff, in both <u>Faverman et al v Doral Financial Corp et al</u>, No 05-4026 (SDNY) and <u>In Re: Doral Financial Corp Securities Litigation</u>, No 05-1706 (SDNY).  Milberg Weiss, lead counsel herein is also listed as counsel in Nos 01-12257, 03-817 and 05-4617. Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, which broke off from Milberg Weiss only five months before this litigation began,

is listed as counsel in Nos 03-817, 05-1706, 05-4617, 05-11934 and 06-0085.  For reasons that will become clear below, the court also notes that Skadden Arps Slate Meagher & Flom, defendants' counsel here, is listed as counsel for certain defendants in Nos 01-12257 and 05-1706.

Class counsel's use of "serial plaintiffs" raises the specter of credibility problems and conflicts of interest, among other issues.  See In re Enron Corp Sec Litig, 206 FRD 427, 455 (SD Tex 2002) ("[S]imultaneous participation in securities class actions or applications for appointment as lead plaintiff could result in institutional investor having fewer resources available and being less able to police counsel's conduct * * *").  The potential for these problems exists in any situation in which a class representative is engaged on many fronts.  The problem is further magnified by any extraordinary distractions of lead counsel's attention.  Given this, the court lacks sufficient assurances of Local 825's independence from class counsel.  See Berger v Compaq Computer Corp, 257 F3d 475, 481 (5th Cir 2001) (PSLRA mandates that "class representatives, and not lawyers, must direct and control the litigation.")

These issues are sufficiently serious to give the court pause regarding Local 825's ability fairly and adequately to represent the interests of the class, as required by FRCP 23(a).  The court recognizes that Local 825 was already appointed lead counsel under the PSLRA's "most adequate plaintiff" provision, which states:

\\

\\

26

United States District Court
For the Northern District of California

**Rebuttable presumption**

**(I) In general**

**Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that--**

**(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);**

**(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and**

**(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.**

**(II) Rebuttal evidence**

**The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff--**

**(aa) will not fairly and adequately protect the interests of the class; or**

**(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.**

15 USCA § 78u-49(a)(3)(iii).

But as discussed above, selection of lead plaintiff was made without open competition. More importantly, the inquiry here is not whether Local 825 can be appointed lead plaintiff. Rather, the inquiry is whether a settlement class can be certified under FRCP 23.

**The appointment of lead plaintiffs occurring as it does in advance of class discovery, is not a final ruling on their appropriateness as Class Representatives. See In re Party City Sec Litig, 189 FRD 91, 111 n21 (DNJ 1999). The proposed class and Class Representatives are to be reviewed according to the standards of Rule 23, without any deference to the earlier determinations made in the appointment of Lead Plaintiffs. 15 USC § 78u-4(a)(3)(B)(iii)(I)(cc).**

In re Oxford Health Plans, Inc, 191 FRD 369, 373 (SDNY 2000).

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10

> Reading the PSLRA in accordance with its plain meaning, the Court concludes that being a Lead Plaintiff under the PSLRA is not the same as being a Class Representative under Rule 23 F.R.Civ.P., although the statute provides that a Lead Plaintiff must "otherwise satisfy the requirements of Rule 23." Obviously there will be actions brought under the PSLRA by multiple plaintiffs which do not qualify for class action treatment under Rule 23, perhaps for lack of numerosity or for some other reason. Congress is deemed to have understood this and must have intended that the function of lead plaintiff under the PSLRA be different from class representative under Rule 23. There is no requirement found in the plain meaning of the statute that a Lead Plaintiff accept designation of class representative under Rule 23, and the statute does not provide for any specific action by the Court should it turn out after a Lead Plaintiff has been appointed; that Lead Plaintiff should on further examination fail to meet all of the requirements of Rule 23, * * *

11   191 FRD at 378-79. See also James Wm Moore, 5 <u>Moore's Federal</u>

12   <u>Practice</u> § 23.25[6] (3d ed 2000) ("[T]he provisions of the [PSLRA]

13   do not replace the ordinary requirements of Rule 23."); House

14   Conference Report No 104-369, 104th Congress, reprinted in 1995

15   USCCAN 730, 733 ("The provisions of the bill relating to the

16   appointment of lead plaintiff are not intended to affect current

17   law with regard to challenges to the adequacy of the class

18   representative or typicality of the claims among the class.");

19   <u>Hevesi v Citigroup, Inc</u>, 366 F3d 70, 83 (2d Cir 2003) ("[T]here is

20   no reason to believe that the PSLRA altered the preexisting

21   standard by which class representatives are evaluated under Rule

22   23.").

23         In assessing the adequacy of a proposed class

24   representative, the court must "feel certain that the class

25   representative will discharge his fiduciary obligations by fairly

26   and adequately protecting the interests of the class." <u>Burkhalter</u>

27   <u>Travel Agency v MacFarms Int'l, Inc</u>, 141 FRD 144, 154 (ND Cal 1991)

28   (quoting <u>Koenig v Benson</u>, 117 FRD 330, 333-34 (EDNY 1987). See

United States District Court
For the Northern District of California

also <u>Crawford v Honig</u>, 37 F3d 485, 487 (9th Cir 1994) ("Adequate
representation depends on the qualifications of counsel for the
representatives, an absence of antagonism, a sharing of interests
between representatives and absentees, and the unlikelihood that
the suit is collusive.")  See also <u>Foe v Cuomo</u>, 892 F2d 196, 198
(2d Cir 1989) (The court's obligation to evaluate the adequacy of
the class representative and counsel continues throughout the
litigation.)  As discussed above, the court has reason to doubt
that Local 825 has met its fiduciary obligations.  Local 825 and
its international are involved in a number of class actions with
class counsel, Local 825 has failed to negotiate a fee arrangement
able to pass even the most forgiving test of reasonableness and
Local 825 has sought, along with defendants, to omit from the
notice to the class a term of settlement that would appear material
to decision-making of at least some class members, if not all.

Approving the settlement under these circumstances would
be inconsistent with the interests of absent class members and the
class action process itself.  That process presupposes that a
single representative can stand in for, and monitor the litigation
on behalf of, numerous others.  This duty is not to be assumed
lightly given that the settlement will extinguish the rights of
absent class members, often without their knowledge.

D

Finally, and with some hesitancy, the court finds it
necessary to address criminal charges pending against lead counsel.
The events surrounding these charges and related charges against
others have been widely publicized and are well-known to counsel on

**29**

United States District Court
For the Northern District of California

both sides of this case.  These charges are also probably well-known to a large segment of the investing public and thus the class herein.  That widespread knowledge, however, does not eliminate the need to consider the effect of the charges here.

Without dwelling on details, lead counsel and several lawyers who worked on this case have been indicted on a variety of criminal charges alleging that lead counsel and certain of its attorneys engaged in the illegal payment of kickbacks to class action plaintiffs.  See CR 05-00587 (CD Cal).  Lead counsel and its most senior lawyer have pleaded not guilty while at least two lawyers who worked on this case and a former partner in lead counsel have pled guilty to these charges.  Because these admitted and denied charges relate to payments to individuals who served, or caused a relative or associate to serve, as a named plaintiff in class actions, the allegations in the criminal proceedings go to the very heart of the fiduciary duties owed to absent class members by a lead plaintiff and lead counsel in a class action.  The conflict that creates this fiduciary duty is well-known and especially acute when a class action settlement is presented to a court for approval.  In that situation, the court is displaced from its typical role of parsing opposing positions presented by adversaries, each incentivized to point up problems in the other's respective requests.  Instead the parties hand the court a single, purportedly complete resolution and appear for oral "argument" pen-in-hand, or more aptly pen-outstretched.  Input from absent class members or third parties is rare, and fully informed input even rarer, if not impossible.  As the court has previously noted in reference to class actions,

> [o]rdinarily the named plaintiffs are nominees, indeed pawns,
> of the lawyer, and ordinarily the unnamed class members have
> individually too little stake to spend time monitoring the
> lawyer-and their only coordination is through him.  The danger
> of collusive settlements * * * makes it imperative that the
> district judge conduct a careful inquiry into the fairness of
> a settlement to the class members before allowing it to go
> into effect and extinguish, by the operation of res judicata,
> the claims of class members who do not opt out of the
> settlement.

In re California Micro Devices Securities Litigation, 168 FRD 257,
261 (ND Cal 1996) (quoting Mars Steel Corp v Continental Illinois
National Bank & Trust, 834 F2d 677, 681-82 (7th Cir 1987)
(Posner)); see also Greenfield v Villager Industries, Inc, 483 F2d
824, 832 n9 (3d Cir 1973) ("Experience teaches that it is counsel
for the class representative and not the named parties, who direct
and manage these actions.  Every experienced federal judge knows
that any statement[ ] to the contrary is sheer sophistry."); Saylor
v Lindsley, 456 F2d 896, 900 (2d Cir 1972) (Friendly) ("There can
be no blinking at the fact that the interests of the plaintiff in a
stockholder's derivative suit and of his attorney are by no means
congruent").

        Where approval for settlement and certification are
sought simultaneously, as is the case here, district courts must be
"even more scrupulous than usual" in examining the fairness of the
proposed settlement.  In re Warfarin Sodium Antitrust Litig, 391
F3d 516, 534 (3d Cir 2004); see also Hanlon v Chrysler Corp, 150
F3d 1011, 1026 (9th Cir 1998) ("The dangers of collusion between
class counsel and the defendant, as well as the need for additional
protections when the settlement is not negotiated by a court
designated class representative, weigh in favor of a more probing
inquiry than may normally be required under Rule 23(e).")  As the

31

<u>Manual for Complex Litigation</u> notes, the nature of the settlement
certification process can "sometimes make meaningful judicial
review more difficult and more important." <u>Manual for Complex
Litigation</u> Fourth (2004) at § 21.612.  A case settled early,
"without sufficient discovery or testing in an adversarial context,
may be next to impossible to assess in terms of the strengths and
weaknesses of the parties' claims and defenses, the appropriate
definition of the class, and the adequacy of the proposed
settlement."  <u>In re Lupron Marketing and Sales Practices
Litigation</u>, 345 F Supp 2d 135, 137 (D Mass 2004) (citing <u>Manual</u> at
§ 21.612.)

> When a district court, as here, certifies for class action
> settlement only, the moment of certification requires
> "heightene[d] attention," * * * to the justifications for
> binding the class members.  This is so because certification
> of a mandatory settlement class, however provisional
> technically, effectively concludes the proceeding save for the
> final fairness hearing.  And, as we held in <u>Amchem,</u> a fairness
> hearing under Rule 23(e) is no substitute for rigorous
> adherence to those provisions of the Rule "designed to protect
> absentees," *ibid.,* among them subdivision (b)(1)(B).

<u>Ortiz v Fibreboard Corp</u>, 527 US 815, 849 (1999) (quoting <u>Amchem
Products, Inc v Windsor</u>, 521 US 591 (1997)).  "The district court's
decision must be supported by sufficient findings to be afforded
'the traditional deference given to such a determination.'" <u>Molski
v Gleich</u>, 318 F3d 937, 946-47 (9th Cir 2003) *(*quoting <u>Local Joint
Executive Bd Trust Fund v Las Vegas Sands, Inc</u>, 244 F3d 1152, 1161
(9th Cir 2001), cert denied, 534 US 973 (2001)).

    It is against this tableau common to all class action
settlement proposals that the criminal charges against lead counsel
pose a concern here, because the kickback arrangements alleged
criminally are that lead counsel gave the paid plaintiffs a greater

United States District Court
For the Northern District of California

1    interest in maximizing the amount of attorney fees awarded to lead

2    counsel than in maximizing the net recovery to absent class

3    members.  The indictment further alleges that lead counsel

4    attorneys engaged in various fraudulent and deceptive acts,

5    practices and devices to conceal these kickbacks.

6        As noted above, Pipefitters Local 522 and 633 Pension

7    Trust Fund sought to appoint Lerach Coughlin, counsel originally

8    filing <u>Gregory</u>, as lead counsel in this action.  Doc #16.  Local

9    522 and 633 Pension Trust Fund later withdrew its motion for

10   appointment of lead plaintiff and lead counsel deferring to Local

11   825 and lead counsel here.  Doc #42.

12       Lerach Coughlin has been represented during the pendency

13   of this litigation by Skadden Arps Slate Meagher & Flom ("Skaden

14   Arps").  Gabe Friedman, <u>Prosecutors Prepare to File Plea Deal for</u>

15   <u>Lerach</u>, San Francisco Daily Journal, Sept 19, 2007, at 1.  Skadden

16   Arps also represents defendants in this action.  By accepting

17   representation of Lerach Coughlin in criminal investigations, the

18   court is troubled whether Skadden Arps is able to probe the

19   adequacy of lead plaintiff and/or lead counsel lest a rigorous

20   challenge uncover problems that might be traced back to Lerach

21   Coughlin.  The automatic discovery stay during the pendency of the

22   motion to dismiss, 15 USC § 78u-4(3)(B), appears to have been in

23   effect during the entire pendency of this litigation.  It would

24   seem, therefore, that class counsel, lead plaintiff, lead counsel's

25   former attorneys now in Lerach Coughlin (since re-named Coughlin

26   Stoia), defendants and defendants' counsel – but not the class –

27   had an interest in avoiding discovery into the adequacy of lead

28   plaintiff.  These circumstances make more stark the extraordinarily


**United States District Court**
For the Northern District of California

high compensation that the proposed settlement would reward class
counsel, the effort to avoid disclosure of the "magic number" and
the involvement in numerous securities class actions of lead
plaintiff.   In light of the foregoing, the proposed class notice
reference to the criminal charges against class counsel, relegated
to a footnote buried on page 13, seems wholly inadequate:

> On May 18, 2006 in the United States District Court for the
> Central District of California (Los Angeles), Milberg Weiss
> Bershad & Shulman LLP and two of its partners were named as
> defendants in an indictment.  The indictment alleges that, in
> certain cases which are identified in the indictment, portions
> of attorneys' fees awarded to the firm were improperly shared
> with certain plaintiffs.  The law firm has pled not guilty.
> The indictment does not refer to this action, and makes no
> allegations of any impropriety in the conduct of this action.

Doc #119 at 13, n3.  The relationships woven amongst the firms
involved here and in other securities class actions brought by the
International Union of Operating Engineers warrant fuller class
notice.

Court supervision of class actions has over time created
a rich jurisprudence which contains several per se rules whether a
given class representative adequately represents the class.  One of
the most fundamental of these rules is that an attorney may not
serve both as class representative and as class counsel.  See, e g,
Susman v Lincoln American Corp, 561 F2d 86, 90-92 (7th Cir 1977).
When class counsel are not effectively monitored by the class
representative, the result is indistinguishable from the situation
in which an attorney serves as both class counsel and class
representative.  Lead counsel's history of using "serial
plaintiffs" and Local 825's willingness to place the proposed
settlement before the court, together suggest that lead counsel has

**United States District Court**
For the Northern District of California

1  effectively made itself the class representative and has assumed

2  control of this action.

3         Lest there be any misunderstanding, the court does not

4  express an opinion on the merits of the pending unresolved criminal

5  charges.  As stated by Judge Rosenbaum of the District of Minnesota

6  in disqualifying class counsel to serve as lead counsel at the

7  outset of another matter:

8        The step the Court takes in this Order does no violence to the
         presumption of innocence.  That presumption, which inheres in
9        the criminal process, is a rule which protects every defendant
         criminally charged under our Constitution.  That presumption
10       remains inviolate.  To the contrary, however, a Grand Jury's
         indictment means that it found probable cause to believe a
11       criminal act has taken place.  It is this determination which
         must be of concern to the Court as it labors to protect [the
12       plaintiffs].

13 In re Medtronic, Inc Implantable Defibrillator Product Liability

14 Litigation, 434 F Supp 2d 729, 732 (D Minn 2006).

15        The court is aware that the case at bar and Local 825 are

16 not implicated in the criminal proceedings.  But given the temporal

17 proximity of this settlement and the criminal proceedings against

18 lead counsel, whether the charges bear on this case is a

19 determination best left to the class following full disclosure.

20       The Court's duty to the [plaintiffs] is focused here. That
         duty requires the Court to question whether, other things
21       being equal, and assuming full knowledge, the [plaintiffs]
         would select as their counsel an attorney whose law firm had
22       been indicted for violating its duties to the court and to its
         clients.  Amongst many highly competent lawyers, the Court
23       suggests few would select an indicted, as opposed to an
         unindicted, law firm.  This is the point at which the Court
24       must, and does, exercise its supervisory authority.

25

26 In re Medtronic, Inc, 434 F Supp 2d at 731-32.

27 \\

28 \\

United States District Court

For the Northern District of California

III

The court's "supervisory authority" and the expanded role of the court in the class action context compel this order. FRCP 23 assigns to the courts both broad responsibility and broad power to monitor the conduct of class actions to ensure their essential fairness. See especially FRCP 23(a), (e). As mentioned above, the adversarial process has ended and plaintiffs' counsel and defense counsel appear arm-in-arm asking that the claims of absent class members be preemptively barred. "But judges in our system are geared to adversary proceedings. If we are asked to do nonadversary things, we need different procedures." In re Continental Illinois Securities Litigation, 962 F2d 566, 573 (7th Cir 1992) (Posner).

The court must apprise itself of all the facts necessary to determine if the settlement is fair and reasonable. The court cannot make such finding here and hence cannot approve the settlement. See Molski v Gleich, 318 F3d 937, 955 (9th Cir 2003) (reversing certification of settlement class due to appearance of inadequate representation and collusion as well as inadequacy of class notice); Staton, supra, 327 F3d 938 (reversing district court's settlement approval based on considerations relating to award of attorney fees). The judiciary is not a "rubber stamp" for settlements that do no reflect the merits of the case. Boyd v Bechtel Corp, 485 F Supp 610, 617 (ND Cal 1979).

Although the court's role in reviewing a proposed settlement is critical, it is also a limited one. The court does not have the ability to "'delete, modify or substitute certain

1    provisions.'  The settlement must stand or fall in its entirety."

2    Hanlon v Chrysler Corp, 150 F3d 1011, 1026 (9th Cir 1998), citing

3    Officers for Justice v Civil Serv Comm'n of San Francisco, 688 F2d

4    615, 628, 630 (9th Cir 1982).

5            Accordingly, based on the concerns discussed above, the

6    court DENIES lead plaintiff's motion for preliminary settlement

7    approval.  The parties shall appear for a case management

8    conference on December 20, 2007 at 3:30pm.

9
10        IT IS SO ORDERED.

11
12        _____

          VAUGHN R WALKER

          United States District Chief Judge