United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CHIRON CORPORATION SECURITIES LITIGATION | No   C-04-4293 VRW |
| _____/ | ORDER |

On November 30, 2007, the court entered an order denying preliminary approval of a proposed settlement in the above-captioned matter.  Doc #130.  The court's initial denial of preliminary approval was based on four concerns with the proposed settlement: (1) the settlement awarded class counsel fees that were eight to ten times typical fees; (2) the proposed notice omitted a material term of the settlement; (3) facts on record or judicially noticed raised question whether lead plaintiff could "fairly and adequately protect the interests of the class"; and (4) the web of relationships between counsel on both sides of this case raised concerns about the adequacy of disclosures in the proposed notice

and a possible appearance of impropriety.  Doc #130, at 1-2.

Following the court's initial denial, plaintiffs amended the settlement, Doc #151, and modified the notice sent to class members.  Docs ##171,173.  The court certified the class and the lead plaintiff, for settlement purposes only, in June 2008.  Doc #171.  Class counsel also reduced the amount of their fee request, from 25% to 17% of the settlement, or from $7.5 million to $5.1 million of the $30 milion settlement.  Doc #151.  The matter came on for a final approval hearing on December 3, 2008, at which the court indicated it would approve the proposed settlement.  Doc #193, Hrg Tr, December 3, 2008 at 41.  The court is satisfied with class counsel's resolution of three of the four concerns.

Further consideration of applicable standards, however, fails to alleviate the court's councern with class counsel's fee request.  As discussed in greater detail below, the court performed a lodestar cross-check and determined that class counsel's reduced fee request implied a multiplier in the range of 4.07-5.15.  While the court believes a substantial multiplier is appropriate given the circumstances of this case, a multiplier of four to five exceeds levels courts have accepted as reasonable fees.  Accordingly, the court GRANTS final approval of the settlement but finds it necessary to reduce class counsel's fee award to $4.6 million.

I

A

This case stems from the highly publicized events surrounding the United States influenza vaccine shortage in 2004.

**United States District Court**
For the Northern District of California

1   Plaintiffs seek recovery for violations of sections 10(b) and 20(a)

2   of the Securities Exchange Act of 1934 on behalf of a class of

3   those who purchased Chiron Corporation stock between July 23, 2003

4   and October 5, 2004, inclusive, on grounds that defendants

5   misrepresented and failed to disclose adverse facts concerning

6   Chiron's ability to produce the Fluvirin influenza vaccine for the

7   United States market.

8           Twelve different law firms appeared on behalf of the

9   various plaintiffs in the six cases that form this litigation.[1]  Of

10   the various plaintiffs in these actions, only two initially sought

11   to serve as lead plaintiff and appoint lead counsel pursuant to 15

12   USC § 78u-4(a)(3):  (1) International Union of Operating Engineers

13   Local No 825 sought to appoint Milberg Weiss Bershad & Shulman, LLP

14   (counsel originally filing the Nach case) and (2) Pipefitters

15   Locals 522 and 633 Pension Trust Fund sought to appoint Lerach

16   Coughlin Stoia Geller Rudman & Robbins, LLP (counsel originally

17   filing the Gregory case).  Five months prior to the commencement of

18   this litigation, the Lerach firm split from Milberg Weiss.  On

19   February 4, 2005, counsel in Jaroslawicz sought to dismiss that

20   action.  On February 24, 2005, Pipefitters Locals 522 and 633

21   Pension Trust Fund withdrew its application to serve as lead

22   plaintiff, leaving only the Local 825 fund's application.  Doc #42.

23   The appointment of the lead plaintiff and its selection of Milberg

24   Weiss as lead counsel were thus made without open competition.

25   Gregory, initiated by the Lerach firm, became the lead case,

26   _____

27       [1]Gregory v Chiron Corp, 04-4293; Nach v Chiron Corp, 04-4346;

      Kramer v Chiron Corp, 04-4416; Jaroslawicz v Bryson, 04-4474; Judith

28   Fisher v Chiron Corp, 04-5137; and Jerome Fisher v Chiron Corp, 05-

      0246.

United States District Court

For the Northern District of California

presumably because it was the first filed action. Milberg Weiss subsequently changed its name to Milberg LLP, and Milberg LLP became lead counsel. Doc #149.

The amended consolidated complaint, Doc #50, followed on April 14, 2005. About five weeks or so after the amended consolidated complaint, on May 26, 2005, Chiron and the individual defendants separately filed motions to dismiss the complaint. Doc ##57, 60. The motions to dismiss were heard on June 29, 2005. At the hearing, the court expressed concern about the clarity of the factual theory plaintiff had alleged in the consolidated amended complaint. See Doc #82, Hrg Tr, June 29, 2005, at 63-64. After some discussion, plaintiffs' counsel agreed to file either a supplemental brief explaining the allegations of the existing pleading or alternatively a further amended consolidated complaint. See Doc #82, Hrg Tr, June 29, 2005, at 67-72. On July 29, 2005, plaintiff filed a supplemental brief, Doc #84, to which defendants responded on August 19, 2005. Doc #90.

While the motions were pending the parties entered into settlement discussions and executed a settlement understanding on June 6, 2006. Doc #103, ¶19 at 5-6. In the meantime, in February 2006, the Securities and Exchange Commission informed Chiron that it was terminating its investigation of Chiron with respect to potential violations of federal securities laws. Doc #103, ¶22. In addition, although investigations of Chiron had been announced by the United States Attorney's Office for the Southern District of New York and the United States House of Representatives, Energy and Commerce Committee, Subcommittee on Oversight and Investigations, neither entity took any action against Chiron. Doc #103, ¶22.

On April 19, 2006, Chiron's shareholders approved a merger with Novartis AG.  Doc #103, ¶23.  Novartis owned 42 percent of Chiron prior to executing the merger agreement.  Doc #103, ¶23.  As a result of the merger, Chiron became an indirect wholly owned subsidiary of Novartis, and Chiron's common stock ceased trading on NASDAQ.  Doc #103, ¶23.

B

The allegations of the amended consolidated complaint, briefly summarized here, concern defendants' statements and alleged misstatements about Fluvirin, an injectable flu vaccine whose distribution in the United States is licensed by the Food and Drug Administration (FDA), following FDA bi-annual inspections and subject to "good manufacturing practices" (GMP) regulations.  Because the manufacturing facility involved in this case was located in Liverpool, England (the "Liverpool plant"), it was also subject to oversight by the Medicines and Healthcare Products Regulatory Agency (MHRA), the British counterpart to the FDA.  Doc #50, ¶¶49, 50.

Until January 2000, the Liverpool plant was owned and operated by Medeva Pharma Ltd.  An FDA inspection of the Liverpool plant in July 1999 uncovered unusually high levels of bacteria and other microorganisms known as "bioburden" in batches of Fluvirin, as well as other evidence of failure to comply with GMP and other requirements.  This prompted a warning letter from the FDA threatening to suspend or revoke Medeva's license if adequate corrective measures were not taken.  Id ¶¶54, 55.  The Liverpool plant then became something of a hot potato, acquired by Celltech

United States District Court

For the Northern District of California

5

Chiroscience in January 2000 only to be resold to England-based PowderJect Pharmaceuticals in October 2000.  Doc #50, ¶¶56, 58.

On March 9, 2001, FDA inspectors visited the Liverpool plant and once again found the production of Fluvirin to be deficient in several respects.  At the conclusion of the inspection, the FDA issued a Form FDA 483 noting "significant objectionable conditions." Doc #50, ¶58.  In June 2003, the FDA conducted another inspection of the Liverpool plant.  Once again, inspectors discovered pervasive quality-control problems and symptoms thereof, including (1) "potentially lethal bacteria" after "ultrafiltration' and "sterile filtration," points in the process by which all bacteria should have been eliminated, (2) poor sanitation practices, including improper maintenance of "curtains" separating sterile areas from non-sterile areas and (3) a susceptibility to contamination in the aseptic connections between tanks of vaccine in the "formulation area" of the plant.  Doc #50, ¶¶72-73.  As in 2001, the FDA inspectors issued a Form FDA 483 and, according to the CAC, although the inspectors initially recommended that official enforcement action be taken due to the "pervasiveness and severity" of the GMP deficiencies at the Liverpool plant, this recommendation was later downgraded to a request that PowderJect take voluntary corrective action.  Doc #50, ¶¶78-79.

Chiron entered on July 8, 2003 when it acquired PowderJect and the Liverpool plaint for $878 million, giving Chiron immediate access to the lucrative flu vaccine market in the United States.  Doc #50, ¶¶43, 45.  In 2003, Chiron realized $219 million in revenues from the sale of 40 million Fluvirin doses worldwide.

In October 2003, Chiron began publicly forecasting that

(1) it would top its 2003 Fluvirin production by manufacturing approximately 50 million Fluvirin doses for the 2004-2005 flu season and (2) its 2004 pro forma earnings per share (EPS) would be in the range of $1.80-$1.90.  CAC ¶¶119-141.  With some minor alterations, these representations continued well into 2004.

On August 26, 2004, Chiron announced that it would delay shipments of Fluvirin pending additional testing, after internal tests identified a small number of lots with sterility problems. Doc #100, Ex A-1 at 7.  Chiron announced that the additional testing would delay the Fluvirin shipment until early October and would prevent the company from recognizing revenue from Fluvirin in the third quarter of 2004.  Doc #119 at 7.  Following the announcement, Chiron's stock price declined from $47.49 per share on August 26, 2004 to $43.41 per share on August 27, 2004.  Doc #119 at 7.

On October 5, 2004 Chiron issued a press release announcing that the MHRA

> has asserted that Chiron's manufacturing process
> does not comply with UK Good Manufacturing
> Practices regulations and has suspended [Chiron's]
> Liverpool facility license to manufacture influenza
> vaccine for three months. * * *  As a result of the
> license suspension, Chiron does not expect to
> record any sales of Fluvirin for the 2004-2005
> season.  Chiron disaffirms its previous full-year
> 2004 pro-forma earnings guidance of $1.80-$1.90 per
> share (a range of $1.50-$1.60 per share on a GAAP
> basis), including its August 2004 guidance of being
> in the low end of this range.

Doc #50, ¶142.

In essence, MHRA concluded that the manufacturing process at the Liverpool plant did not conform to accepted manufacturing practices and had consequently produced a notable number of contaminated

Fluvirin doses.  MHRA's Inspection Action Group concluded that it would be too risky to allow Chiron to release potentially contaminated vaccines and thus MHRA suspended Chiron's license. Following the announcement, Chiron's trading stock price dropped from $45.42/share to close at $37.98/share, a one-day drop of 16.3 percent.  Doc #50, ¶142.  A week later, this litigation commenced.

Plaintiffs contend that Chiron's projections regarding its (1) expectation to ship approximately 50 million Fluvirin doses worldwide and (2) 2004 pro-forma EPS of $1.80-$1.90 were false and misleading when made because Chiron omitted material information known to it at the time of the statements, regarding manufacturing deficiencies at the Liverpool plant.  Based on these allegations, plaintiffs sought relief against Chiron, Pien (former Chiron CEO), Smith (former Chiron CFO) and Lambert (former President of Chiron Vaccines).

C

As a result of the provisions of 15 USC § 78u-4(b)(3)(B) and the early settlement discussions conducted by counsel, it appears that little, if any, discovery was conducted into the merits of plaintiffs' allegations.  The litigation thus appears to have proceeded almost directly from pleading to settlement with no ruling on the pleadings or substantial merits discovery.  Both sides stipulated to a proposed settlement on March 29, 2007.  The proposed settlement provided that defendants would pay $30 million in cash plus an amount equivalent to interest at the thirty-day Treasury Bill rate from June 6, 2006 to the date of payment, which would be paid into a common fund to be distributed to class

8

members.  Doc #100, ¶¶4, 9-11.

The court denied preliminary approval of the settlement on November 30, 2007, citing four concerns noted above.  Plaintiffs subsequently responded to each the court's concerns:  (1) Class counsel agreed to reduce its request from 25 percent to 17 percent of the total award, from $7.5 million to $5.1 million.  Doc #151, at 2.  Class counsel also agreed to move certain administrative costs from the lodestar calculation to the expense category.  Id. (2) Plaintiffs agreed to include the "magic number" of Chiron common shares in the notice sent to class members, and the court approved the amended notice on June 18, 2008.  Doc #171, ¶6.  (3) The court certified International Union of Operating Engineers Local No 825 as lead plaintiff on June 18, 2008.  Id, ¶3. (4) Plaintiffs included all pertinent information regarding the relationships among law firms involved in this matter in the notice and invitation to comment sent to class members.  Docs ## 171, 173.

To enable class members to voice their concerns about the terms of the settlement and with the court's encouragement, counsel created a website and an email address specific to this settlement. The website contained links to all relevant documents in the case. The 121,00 notices sent to class members encouraged class members to send emails (or standard letters) explaining their concerns. Doc #171, ¶13.  Most of the forty-three class members who sent emails had questions about settlement procedures.  Seven of the forty-three raised concerns about the proposed settlement.  All seven expressed concern about high class counsel fees, although none provided detailed explanations of his or her concerns.  Four

United States District Court
For the Northern District of California

of the seven class members expressed concern about the low value of the settlement, and one of the seven class members expressed concern that the web of relationships among the law firms involved may have affected the settlement.  No class members complained by standard mail.

Class members appear to have made active use of the website.  Data submitted by class counsel indicates that the website was viewed 20,560 times as of December 2, 2008. Doc #194 Exh A at 2.  The website also logged 6,661 hits to the various litigation-related documents.  Id.  The most popular documents were the Chiron Proof of Claim and Release Form, with 871 hits, and the Chiron Notice of Pendency of Class Action, with 637 hits.  Id. Class counsel also noted at the final approval hearing that all seven class members who complained about the settlement used the website to register their complaints.  Doc #193, Hrg Tr, December 3, 2008, at 24-25.

On October 29, 2008, plaintiffs filed their motion for final approval of the settlement.  Doc #182.  Federal Rule of Civil Procedure 23(e) requires court approval for the settlement of any class action.  In order to be approved, a settlement must be "fundamentally fair, adequate and reasonable."  Torrisi v Tucson Elec Power Co, 8 F3d 1370, 1375 (9th Cir 1993) (quoting Class Plaintiffs v Seattle, 955 F2d 1268, 1276 (9th Cir 1992), cert denied, 506 US 953 (1992)), cert denied, 512 US 1220 (1994). Because class counsel's fee request remains the problematic element of the proposed settlement, the court will begin with this issue.

**United States District Court**

For the Northern District of California

**II**

**A**

After initially requesting $7.5 million in fees, class counsel now request $5.1 million in fees and $380,717.82 in expenses. Doc #182, at 13. The new fee request represents 17 percent of the total settlement, and the total amount requested is 18.27 percent of the settlement.

"Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is 'fundamentally fair, adequate, and reasonable.'" Staton v Boeing Co, 327 F3d 938, 963 (9th Cir 2003), quoting FRCP 23(e). The court is obligated to conduct an independent inquiry into the reasonableness of any attorney fee provisions of a class action settlement even in the face of an agreement between the parties regarding the payment and amount of attorney fees and costs.

Common fund cases create a situation in which normal reliance on the adversary process to police the appropriateness of a fee award is unavailing. Report of the Third Circuit Task Force, Court Awarded Attorney Fees (Task Force Report), 108 FRD 237, 251 (3d Cir 1985). A class action defendant has little or no incentive to contest the amount allocated to attorney fees in a proposed settlement, provided the total amount of the settlement is acceptable. Task Force Report at 266. "[T]o avoid abdicating its responsibility to review the agreement for the protection of the class, the Ninth Circuit requires that a district court must carefully assess the reasonableness of a fee amount spelled out in

a class action settlement agreement." <u>Staton</u>, 327 F3d at 963

(citing <u>Piambino v Bailey</u>, 610 F2d 1306, 1328 (5th Cir 1980);

<u>Strong v BellSouth Telecomms</u>, 137 F3d 844, 848-50 (5th Cir 1998);

<u>Jones v Amalgamated Warbasse Houses, Inc</u>, 721 F2d 881, 884 (2nd Cir

1983)).  This obligation is especially strong if the fee award

appears high.  <u>Staton</u>, 327 F3d at 966.

The court's obligation to ensure the fee award is

reasonable exists in part because class members have little

incentive to register complaints about the award.  <u>In re</u>

<u>Continental Ill Sec Lit</u>, 962 F2d 566, 573 (7th Cir 1992).  While a

substantial reduction in the amount class counsel receive as fees

creates a larger pool for class members to share, an individual

class member may see only a de minimus increase in his settlement

value.  Id.  Individual class members may therefore lack the

financial incentive to complain about an excessive fee award.  But

class members' silence does not lessen the court's responsibility

to ensure that the fee award is fair and reasonable.  Id.

To determine whether a fee award is reasonable, the court

uses a lodestar cross-check along with a comparison of the

percentage of the common fund sought as fees.  The Ninth Circuit

has held that a fee of "25 percent has been a proper benchmark

figure, which [the district court] can then adjust upward or

downward to fit the individual circumstances" of the case.  <u>Paul,</u>

<u>Johnson, Altom & Hunt v Graulty</u>, 886 F2d 268, 273 (9th Cir 1975).

As no objective framework has developed to describe a case's

"individual circumstances," judges can rely on numerous criteria to

determine whether to adjust an award away from the benchmark.  See

<u>Kerr v Screen Extras Guild</u>, 526 F2d 67, 70 (9th Cir 1975).  The district court can use the lodestar cross check to determine whether the proposed fee award is reasonable in light of the hours devoted to the case.  <u>Six (6) Mexican Workers v Arizona Citrus Growers</u>, 904 F2d 1301, 1312 (9th Cir 1990); <u>In re Washington Public Power Supply System Securities Litigation</u>, 19 F3d 1291, 1296 (9th Cir 1994).  The lodestar cross check is not meant as a substitute for percentage based recovery; rather, the check ensures that a percent amount that appears reasonable actually is reasonable in light of the effort class counsel expended.  The cross check prevents class counsel from receiving a windfall simply because the settlement was large.  <u>In re Elan Sec Lit</u>, 385 F Supp 2d 363, 372-73 (SDNY 2005).

The lodestar cross-check properly conducted relies on standardized hourly rates for attorneys, with a multiplier of the total lodestar amount based on class counsel's assumption of the risk of no recovery and the delay inherent in a contingent fee arrangement.  In order for the lodestar to provide a meaningful comparison across cases, the court must use standardized rates – more about this presently.

A widely recognized compilation of attorney and paralegal rate data is the <u>Laffey</u> matrix, so named because of the case that generated the index.  In <u>Laffey v. Northwest Airlines, Inc</u>, 572 F Supp 354 (DDC 1983), aff'd in part, rev'd in part on other grounds, 746 F2d 4 (DC Cir 1984), the court employed a variety of hourly billing rates to account for the various attorneys' different levels of experience.  The <u>Laffey</u> matrix has been regularly

**United States District Court**
For the Northern District of California

1  prepared and updated by the Civil Division of the United States
2  Attorney's Office for the District of Columbia using the Consumer
3  Price Index.[2]  The <u>Laffey</u> matrix is especially useful when the work
4  to be evaluated consists of a mix of senior, junior and mid-level
5  attorneys, as well as paralegals, as is usually the case in complex
6  litigation.  <u>Laffey</u> matrix rates are available in appendix A.

7       <u>Laffey</u> matrix rates are, however, tailored for the
8  District of Columbia, which has a lower cost of living than New
9  York and Los Angeles (the cities in which class counsel operates).
10  Accordingly, to make a locality adjustment, the court will use the
11  federal locality pay differentials based on federally compiled cost
12  of living data.  See <u>http://www.opm.gov/oca/07tables/indexGS.asp</u>;
13  <u>In re HPL</u>, 366 F Supp 2d at 921 (adjusting locality pay
14  differentials based on the geographical region in which lead
15  counsel's firm operated).  A review of the pay tables shows the
16  Washington-Baltimore area has a +18.59 percent locality pay
17  differential; the New York area has a +24.57 percent locality pay
18  differential; and the Los Angeles area has a +24.03 percent
19  locality pay differential.  Adjusting the <u>Laffey</u> matrix figures
20  accordingly will yield appropriate rates for the respective
21  geographical regions: +5 percent for New York and +4.6 percent for
22  Los Angeles.  The New York and Los Angeles rates are provided in
23  tables in Appendix B.

24       In addition to the <u>Laffey</u> matrix, an updated <u>Laffey</u>
25  matrix, adjusted using the Legal Services Index of the Consumer

26

27  ───────────────

28       [2]http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_
    Matrix_3.html, visited December 2, 2008.

United States District Court
For the Northern District of California

Price Index, also offers standardized rates for a lodestar cross-check.[3]  As the Legal Services Index measures national trends in attorney rates, the updated _Laffey_ matrix measures nationwide changes in rates.  Accordingly, the court will not make a cost of living adjustment to these rates.  Updated _Laffey_ matrix rates are listed in Appendix C.

Because the updated _Laffey_ matrix is adjusted using the nationwide legal services index, the updated matrix may not reflect the Supreme Court's direction to consider "prevailing market rates in the relevant community." _Blum v Stenson_, 465 US 886, 895 (1984).  Typically, the "relevant community" refers to lawyers of "reasonably comparable skill, experience and reputation" in the local community. _Kattan ex rel Kattan v Dist of Columbia_, 995 F2d 274, 278 (DC Cir 1993).  The updated _Laffey_ matrix does not provide this "geographic specificity." _Woodland v Viacom Inc_, – FRD –, 2008 WL 500025, *2 (DDC 2008).

Neither is the updated _Laffey_ matrix truly national. When the matrix was developed in 1989, its base rates were local to the Washington DC market.[4]  The matrix has been adjusted upward for almost twenty years using national inflation data.  Thus, the updated _Laffey_ matrix is neither truly national nor truly local in nature.  Nonetheless, the court will consider the updated _Laffey_ matrix as one approximation of national rates in spite of its shortcomings, in part because the updated matrix provides one of only a few sources of standardized billing rates.

---

[3]www.laffeymatrix.com, visited December 30, 2008.

[4]See www.laffeymatrix.com/expert.html, visited December 30, 2008.

15

**United States District Court**
For the Northern District of California

The court will not, at this time, at least, enter into any debate about which of these two standardized rate calculations better reflects the market value of legal services.  Doc #151 at 5-7.  Compare, e g: <u>Salazar v District of Columbia</u>, 123 F Supp 2d 8, 13-15 (D DC 2000)(Kessler, J)(upholding the use of updated <u>Laffey</u> rates as evidence of prevailing rates in Washington DC) and <u>Woodland v Viacom Inc</u>, – FRD –, 2008 WL 5000025 (D DC 2008) (Facciola, J)(discrediting the updated <u>Laffey</u> matrix because it does not provide the geographic specificity necessary to represent prevailing rates in the relevant community).

Nor does the court contend that the <u>Laffey</u> matrix or its updated cousin represent a precise measure of the market rates for attorney services.  Cf Rubenstein, <u>Reasonable Rates: Time to Reload the (Laffey) Matrix</u>, 2 Class Action Attorney Fee Digest 47 (Feb 2008).  Both matrices nonetheless have features that make them extremely useful.  Both have been compiled from baselines that are adjusted in accordance with inflation adjustments consistently applied over time.  Further, the matrices provide different compensation levels depending on attorneys' level of experience. This is a particularly important feature because it allows courts to compare multipliers meaningfully among cases requiring mostly partner work as well as cases requiring mostly associate work.  Use of a blended hourly rate for attorney services fails to capture this differentiation.  A blended or average rate either overcompensates or undercompensates depending on the experience levels of the lawyers involved in the litigation.  It would seem the rare case in which the experience-level mix of lawyer inputs

mirrors the average of the lawyers' hourly rates.  Thus, whatever criticism may attend use of the <u>Laffey</u> rates, they are useful tools.  In any event, counsel here have not offered the court a substitute more accurate measure.

The importance of using a consistent standard index like the <u>Laffey</u> matrices deserves a further few words.  The failure of many courts, commentators and others who report class counsel fees to use standardized hourly rates renders their reported multipliers problematic.  A little arithmetic illustrates the point.  Assume that class counsel claims their average hourly rate is $400, but claim a fee after application of the multiplier of $750.  The reported multiplier in that scenario is 1.8.  If, however, an hourly rate of $300 were claimed, the reported multiplier is 2.5, some forty percent higher.  As attorneys' claimed hourly rates vary widely, reported multipliers will be thus affected.  Of course, one could accept attorneys' claimed hourly rates and then apply some multiplier and this apparently is what many, if not most, courts do.  But attorneys' claimed hourly rates may not accurately capture the going market rate for attorney services upon which fee awards are supposed to be based.  See <u>Blum</u>, 465 US at 896 n11.  To the extent that counsel can show <u>Laffey</u> rates understate (or overstate) the market rate for the attorney services involved in a particular case that adjustment can (and should) be included in a higher (or lower) multiplier, thus making this adjustment explicitly.  Counsel have attempted no such demonstration here.

Whatever their imperfections, the <u>Laffey</u> matrices provide a standard that allows multipliers to be compared in one case to

another.  Able counsel have not come forward with a better standard than the Laffey matrices, so for now they must do.  The court will thus consider both the Laffey matrix and the updated Laffey matrix to determine the reasonableness of class counsel's fee request and use 2007 billing rates to provide the best average rate for work performed from 2004-2008.

The court will perform two different lodestar cross-check calculations using original and updated Laffey rates.  The court will use class counsel's hours through May 2008 even though the court is somewhat hesitant to apply a multiplier to attorney work performed after the court initially denied approval in November 2007, Doc #130.  The court nonetheless finds it appropriate to include some hours worked after the settlement was finally negotiated, because class counsel still needed to obtain judicial approval of the settlement.  Because class members cannot recover until the court approves the settlement, this work did confer a benefit on class members.  The court will however exclude hours spent calculating attorneys' fees.  Because the court is performing cross-checks and not determining which lodestar most accurately reflects the value of class counsel's work, the court will consider the resulting multipliers as the range implied by counsel's fee request.  The court will then determine whether the individual circumstances in this case support the range of multipliers.

The court will perform its calculations as follows.  Only categories covered by the Laffey matrix are included.  When adjusting original Laffey rates for location, New York rates are used for lead counsel summer clerks and paralegals, and Mr Long's

United States District Court
For the Northern District of California

18

United States District Court

For the Northern District of California

billing rate reflects a 1 percent downward adjustment for Delaware. The court will adjust requested rates below <u>Laffey</u> rates upward to ensure the lodestar calculation provides a meaningful comparison to other multipliers.

The two charts in Appendices D and E represent the two different lodestar data sets.  The chart in Appendix D uses original <u>Laffey</u> rates and the chart in Appendix E uses updated <u>Laffey</u> rates.  The resulting multipliers are displayed in Table 1 below.

| Table 1: Requested Fee and Multipliers | | | |
|---|---|---|---|
| <u>Data Set</u> | <u>Lodestar</u> | <u>Fee Request</u> | <u>Multiplier</u> |
| Appendix D (original <u>Laffey</u> rates) | $991,722 | $5,100,000 | 5.15 |
| Appendix E (updated <u>Laffey</u> rates) | $1,254,245 | $5,100,000 | 4.07 |

Based on the court's calculations, the multipliers range from 4.07 to 5.15.[5]  To illustrate, using updated <u>Laffey</u> rates and a multiplier of 4.07, a partner with twenty years of experience would receive $2499 per hour ($614 x 4.07) and a paralegal would receive $566 ($139 x 4.07) per hour.  Using original <u>Laffey</u> rates and a multiplier of 5.15, that (New York based) partner would

_____

[5] The court also considered whether to apply a multiplier to hours worked after the court denied preliminary approval of the settlement in November 2007.  If it had not used those hours in the multiplier calculation and instead compensated those hours at a straight hourly rate, the multiplier range would have been 5.21-6.66.

receive $2379 per hour ($462 x 5.15) and the paralegal would receive $676 per hour ($131.25 x 5.15).

In other scenarios the court has encountered, the multiplier is greater than one and often in the order of two to four.  See, e g, Van Vranken v Atlantic Richfield Corp, 901 F Supp 294, 298 (ND Cal 1995) ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation."); Behrens v Wometco Enterprises, Inc, 118 FRD 534, 549 (SD Fla 1988) ("[The] range of lodestar multiples in large complicated class actions [varies from] a low of 2.26 to a high of 4.5."); see also In re Elan, 385 F Supp 2d at 376 (reducing fee award from the requested 4.72 multiplier to a multiplier of 3.47)   These judicial observations are borne out in a more systematic study of common fund class action fee awards compiled a few years ago.  Beverly C Moore, et al, 24 Class Action Reports, no 2 (March-April 2003). This study included 877 securities class actions, 391 of which reported multiplier data.  Of these 391 cases, 353 involved class recoveries of $50 million or less.  The multipliers observed in these cases charted against the amounts of recovery are displayed in the following chart:



**Multiplier v Class Recovery $50 Million or Less**

Linear and non-linear regressions show the multiplier in these cases to fall in the range of 0.5 to 3.0. This chart shows that negative multipliers – those below 1.0 – are more common than the court previously perceived. See Doc #190 in 03-5138 VRW (<u>In re Portal Software, Inc Sec Litig</u>). Because these multipliers appear not to have been calculated with standardized hourly rates, they may not afford definitive guidance. The court expects some variation between multipliers calculated with standardized rates and multipliers calculated with attorneys' requested rates.

The court will nonetheless use the study as a starting point to compare multipliers in this case with other reported class action multipliers. The 4.07-5.15 range barely brushes against the

United States District Court
For the Northern District of California

high end of typical lodestar multiplier range (2-4.5).  Some of
that disparity may be explained by the court's use of standardized
rates, which may be lower than attorneys' request rates and may
result in a higher multiplier.  The court is not convinced,
however, that updated _Laffey_ rates are significantly different from
typical attorney rates.  While the rates for the most senior
lawyers claimed by class counsel are higher than updated _Laffey_
rates, hourly rates claimed for other less than the most senior
lawyers claimed by counsel fall fairly well in line with updated
_Laffey_ rates.  Compare Appendix C and Docs ## 127, 128.  Indeed,
the updated _Laffey_ matrix was created to reflect attorney billing
practices accurately.  See www.laffeymatrix.com/expert.html,
visited December 30, 2008.  While the range of typical multipliers
must be viewed broadly because the rates used to calculate the
multiplier were not standardized, by any measure class counsel's
fee request implies a multiplier outside the standard range.  This
is not the end of the analysis, however, because the court can
award a large multiplier in appropriate cases.  Accordingly, the
court will consider a range of factors to determine whether a
larger than usual multiplier might be appropriate based on the
facts in this case.

          Some factors that may justify a multiplier outside the
usual range include the risk of non-recovery at the outset of
litigation, the complexity of the action, class counsel's
performance in obtaining the best settlement possible for the
class, class counsel's efficiency and whether class members are
satisfied with the settlement.  See _Goldberger v Integrated_

Resources, Inc, 209 F3d 43, 47 (2d Cir 2000)(listing factors that support the use of a multiplier greater than one in common fund settlement cases); Van Vranken, 901 F Supp at 297 (discussing factors that could justify a higher than typical fee award).

Class counsel argue that these factors justify their requested fee award. Specifically, counsel argues that they obtained a larger than average settlement (10.7 percent of estimated damages rather than what counsel asserts as the typical median, 2.3-2.8 percent). Doc #182 at 43. Further, counsel assert that the risk of non-recovery was high because of the difficulty in demonstrating scienter, one of the elements of their claim. Id at 44. Counsel point to the dismissal of several securities class actions as an indication that securities class actions are often dismissed with no recovery for class counsel. Id at 45. Counsel point out that their work was high quality, measured both by their experience and their success in this case. Id at 46. Finally, counsel note that while class members had ample opportunity to object to the settlement via email through the court-created website, only seven class members voiced any concern about the size of class counsel's requested fee award.

The court accepts most of counsel's arguments. Counsel worked hard to obtain a good settlement for class members. The risk of non-recovery was real. Certainly class counsel deserve a multiplier. The real question is whether they deserve a multiplier as high as they have requested, and in this case, the court believes a multiplier in the three to four range is more appropriate for the following reasons.

23

**United States District Court**
For the Northern District of California

1    The court turns first to the risk of non-recovery implied
2    in class counsel's requested multiplier.  The risk of non-recovery
3    is one of the most important factors the court considers when
4    determining whether to award a multiplier.  <u>Goldberger</u>, 209 F3d at
5    54.  Accordingly, the court conducts a calculation to determine an
6    estimate of the risk implied by the multiplier.  The equation used
7    is simple: (value of $1 of attorney time plus interest)/(risk of
8    non-recovery) = multiplier.  The court will use an interest rate of
9    10% and take one dollar worked in the middle of the case.  As class
10   counsel has worked four years on this case, the court will
11   calculate 2.5 years of (non-compounding) interest on the dollar.
12   The equations thus become $1.25/p = 4.07$ or $1.25/p = 5.15$ where p is
13   the probability of non-recovery and 4.07 and 5.15 are class
14   counsel's requested multipliers. In the first equation, p = .31.
15   In the second, p = .25.  Class counsel is thus asking to be
16   compensated assuming they would only recover 25 to 31 percent of
17   the time.  The court does not believe this accurately represents
18   the risk faced by counsel at the outset of this litigation.

19   Counsel's risk level was not out of the ordinary.  Twelve
20   different law firms filed six different cases that make up this
21   litigation, which indicates that at the outset many firms were
22   willing to take the risk.  See <u>In re Elan</u>, 385 F Supp 2d at 375
23   (noting that because many firms wanted to bring a suit, the risk of
24   non-recovery at the outset was not that great).  Further, both the
25   Securities and Exchange Commission and the United States Attorney's
26   Office for the Southern District of New York announced
27   investigations into potential Chiron wrongdoing, Doc #103, ¶22,

**United States District Court**
For the Northern District of California

which provides yet another indicator that counsel had a good chance
to recover. <u>In re Elan</u>, 385 F Supp 2d at 375.  At the outset, this
case was far from a long shot.  While class counsel certainly faced
a risk, these circumstances show their chances of recovery were
greater than one in four.

     The other factors, including the quality of work
performed by class counsel and the amount of the settlement
obtained in the face of possible dismissal, do indicate that class
counsel deserves a multiplier.  The recovery for the class was
substantial but compared to the claimed estimate of class damages
not large.  Class counsel did a good job and did so at a time when
the principal law firm representing the class was undergoing
significant challenges.  Counsel's continuing professionalism in
the face of these challenges is commendable but that unfortunate
circumstance does not warrant extracting an unusually large fee
award from the class's share of the recovery.  Nothing about these
other factors is unique enough to justify a multiplier as large as
the one class counsel has requested.

     Class members had the opportunity to comment on the terms
of the settlement, and for the most part, class members did not
voice concern about the amount that class counsel would obtain in
fees.  But, as noted, class members do not always have an incentive
to speak up, because an individual class member's recovery may not
significantly increase if class counsel's fee award is reduced.  <u>In
re Continental Ill Sec Lit</u>, 962 F2d at 573.  The court believes
that class members' relative silence, especially in a case where
class members could easily express disapproval via email, is

**United States District Court**

For the Northern District of California

1  another factor that justifies a multiplier in the upper range.

2  Class members' silence does not however give the court authority to

3  approve a fee award that provides class counsel with a windfall.

4       Accordingly, the court will reduce class counsel's fee

5  award from $5.1 million to $4.6 million.  As illustrated in Table

6  2, below, this award implies a multiplier of 3.67 - 4.64.  Using

7  the equation described above, (value of $1 of attorney time plus

8  interest)/(risk of non-recovery) = multiplier, assuming a ten

9  percent interest rate, this new fee award assumes a risk of non-

10 recovery of between twenty-seven percent (1.25/p = 4.64) and

11 thirty-four percent (1.25/p = 3.67).  While the court recognizes

12 this is still a generous multiplier, it more accurately represents

13 the risk faced by class counsel and brings the award within the

14 standard range of multipliers.  The court is thus confident this

15 award reasonably compensates class counsel and is not unfair to

16 either the class or class counsel.

17

| Table 2: Adjusted Award | | | |
|---|---|---|---|
| Data Set | Lodestar | Fee Award | Multiplier |
| Appendix D (original Laffey rates) | $991,722 | $4,600,000 | 4.64 |
| Appendix E (updated Laffey rates) | $1,254,245 | $4,600,000 | 3.67 |

27      The court now turns to the other factors that prevented it

28 from granting preliminary settlement approval in November 2007.

**United States District Court**

For the Northern District of California

**B**

The court initially expressed concern that the notice sent to class members did not include the "magic number" of Chiron Corporation common shares that, if held by opt-outs, would trigger defendants' rights to terminate the settlement. The court considered this a material term of the settlement. Doc #130, at 21. The plaintiffs agreed to include the "magic number" of Chiron common shares in the notice sent to class members, and the court approved the amended notice on June 18, 2008. Doc #171, ¶6. The court's approval of the notice adequately addressed this concern.

**C**

The court was concerned that the lead plaintiff, International Union of Operating Engineers Local 825, would not fairly and adequately represent all class members because of its relationship with class counsel and its involvement as lead counsel in other securities class action lawsuits. Doc #130, at 24-26. These concerns were resolved when the court certified Local 825 as lead counsel on June 18, 2008. Doc #171, ¶3.

**D**

The court's final concern involved criminal charges then pending against lead counsel. Doc #130, at 29-30. The court's concerns were twofold: (1) to ensure that all class members received full and fair disclosure of the charges and the attorney relationships and (2) to avoid any appearance of impropriety. The court was never concerned with any actual wrongdoing in connection with this case. Doc #130, at 35.

United States District Court
For the Northern District of California

To address its concerns, the court required that the notice sent to class members contain a complete and accurate statement of all relevant facts. Docs ##171, 173. Further, the notice invited class members to comment regarding any concerns members had with counsel in this case. The court received only one response from a class member, who noted that "it is hard to believe there was no inter-mingling in this litigation." Email from Roy W and Patricia A Fogle, August 12, 2008. No other class members raised any concerns. Class members' overwhelming silence indicates that class members do not believe criminal charges or the web of attorney relationships affected this case. The court is thus satisfied that no appearance of impropriety exists in this case.

III

The court has reviewed and resolved its initial concerns with the proposed settlement and now concludes that the updated settlement, Doc #182, is fair and reasonable in this case. Class counsel's fee request, however, must be reduced. Accordingly, the court reduces class counsel's fees to $4.6 million and GRANTS lead plaintiff's motion for final settlement approval.

IT IS SO ORDERED.

_____

VAUGHN R WALKER
United States District Chief Judge

28

**Appendix A: <u>Laffey</u> Base Rates**

| Original <u>Laffey</u> Matrix 2007 Rates | |
|---|---|
| <u>Experience</u> | <u>Rate Per Hour</u> |
| 20+ Years | $440 |
| 11-19 Years | $390 |
| 8-10 Years | $315 |
| 4-7 Years | $255 |
| 1-3 Years | $215 |
| Paralegals and Law Clerks | $125 |

**Appendix B: New York and Los Angeles <u>Laffey</u> Rates**

| Adjusted 2007 original <u>Laffey</u> Rates | | |
|---|---|---|
| <u>Experience</u> | New York Hourly Rate (+5% Adjustment) | Los Angeles Hourly Rate (+4.6% Adjustment) |
| 20+ Years | $462 | $460.24 |
| 11-19 Years | $409.50 | $407.94 |
| 8-10 Years | $330.75 | $329.49 |
| 4-7 Years | $267.75 | $266.73 |
| 1-3 Years | $225.75 | $224.89 |
| Paralegals and Law Clerks | $131.25 | $130.75 |

Appendix C: Updated _Laffey_ Rates

| Updated _Laffey_ Matrix 2007 Rates | |
|---|---|
| __Experience__ | __Rate Per Hour__ |
| 20+ Years | $614 |
| 11-19 Years | $509 |
| 8-10 Years | $452 |
| 4-7 Years | $313 |
| 1-3 Years | $255 |
| Paralegals and Law Clerks | $139 |

**United States District Court**
For the Northern District of California

Appendix D: Original <u>Laffey</u> Rates

| Original <u>Laffey</u> Rates for Hours through May 27, 2008 | | | | | |
|---|---|---|---|---|---|
| <u>Attorney/<br>Paralegal</u> | <u>Location</u> | <u>Years<br>Experience</u> | <u>2007<br>Laffey<br>Rate</u> | <u>Total<br>Hours</u> | <u>Total<br>Lodestar</u> |
| Bauer, G | NY | 27 | 462.00 | 110.5 | $51051 |
| Bershad, D | NY | 42 | 462.00 | 1.25 | $577.50 |
| Graziano, S | NY | 15 | 409.50 | 7.5 | $3,071.25 |
| Kartapoulos,<br>A | NY | 25 | 462.00 | 378.5 | $174,867 |
| Kusel, E | NY | 12 | 409.50 | 72.25 | $29,586.38 |
| Rogers, K | LA | 11 | 407.94 | 6.5 | $2,651.61 |
| Schulman, S | NY | 26 | 462.00 | 2.75 | $1,270.50 |
| Seidman, P | NY | 12 | 409.50 | 67 | $27,436.50 |
| Weiss, M | NY | 47 | 462.00 | 31.4 | $14,506.80 |
| Westerman, J | NY | 27 | 460.24 | 317.25 | $146,569.50 |
| Andrejkovis,<br>P | NY | 11 | 409.50 | 1.5 | $614.25 |
| Furukawa, M | LA | 3 | 224.89 | 60.5 | $13,605.85 |
| Lin, E | LA | 13 | 407.94 | 960.5 | $391,826.37 |
| Lipton, A | NY | 6 | 267.75 | 0.25 | $66.94 |
| Long, B | DE | 9 | 313.43 | 0.75 | $235.07 |
| McCulloch, K | LA | 12 | 407.94 | 24.3 | $9,912.94 |
| Mills, J | NY | 4 | 267.75 | 2.5 | $669.38 |
| Quinn, MJ | NY | 15 | 409.50 | 0.25 | $102.38 |
| Rado, A | NY | 7 | 267.75 | 75.5 | $20,215.13 |
| Chowdhury, I | LA | 9 | 329.49 | 9.25 | $3047.78 |
| Kroll, A | NJ | 33 | 462 | 4.6 | $2125.20 |
| Giblin, V | NJ | 11 | 409.50 | 52.5 | $21,498.75 |
| Finnell, L | NJ | 3 | 225.75 | 0.1 | $22.58 |

| Glancy, L | LA | 19 | 407.94 | 0.75 | $305.96 |
| Goldberg, M | LA | 11 | 407.94 | 12.0 | $4,895.28 |
| MacDiarmid, D | LA | 4 | 266.73 | 1.2 | $320.08 |
| Murray, B | NY | 17 | 409.50 | 8.0 | $3,276.00 |
| Belfi, E | NY | 11 | 409.50 | 8.5 | $3,480.75 |
| Donders, L | NY | 5 | 267.75 | 1.0 | $267.75 |
| Hinton, C | NY | 4 | 267.75 | 0.5 | $133.88 |
| Patton, A | NY | 4 | 267.75 | 1.6 | $428.40 |
| Summer Clerks | NY | - | 131.25 | 6.25 | $820.31 |
| Paralegals (LA) | | - | 130.75 | 345.45 | $45,167.59 |
| Paralegals (NY) | | - | 131.25 | 127.25 | $16,701.56 |
| Paralegals (NJ) | | - | 131.25 | 3.0 | $393.75 |
| | | | Totals | 2702.9 | $991,722 |

**United States District Court**
For the Northern District of California

## Appendix E: Updated Laffey Rates

| Adjusted Laffey Rates for Hours through May 27, 2008 | | | | | |
|---|---|---|---|---|---|
| Attorney/ Paralegal | Location | Years Experience | 2007 Laffey Rate | Total Hours | Total Lodestar |
| Bauer, G | NY | 27 | 614 | 110.5 | $67,847 |
| Bershad, D | NY | 42 | 614 | 1.25 | $767.50 |
| Graziano, S | NY | 15 | 509 | 7.5 | $3,817.50 |
| Kartapoulos, A | NY | 25 | 614 | 378.5 | $232,399 |
| Kusel, E | NY | 12 | 509 | 72.25 | $36,775.25 |
| Rogers, K | LA | 11 | 509 | 6.5 | $3,308.50 |
| Schulman, S | NY | 26 | 614 | 2.75 | $1,688.50 |
| Seidman, P | NY | 12 | 509 | 67 | $34,103 |
| Weiss, M | NY | 47 | 614 | 31.4 | $19,279.60 |
| Westerman, J | NY | 27 | 614 | 317.25 | $194,791.50 |
| Andrejkovis, P | NY | 11 | 509 | 1.5 | $763.50 |
| Furukawa, M | LA | 3 | 255 | 60.5 | $15,427.50 |
| Lin, E | LA | 13 | 509 | 960.5 | $488,894.50 |
| Lipton, A | NY | 6 | 313 | 0.25 | $78.25 |
| Long, B | DE | 9 | 452 | 0.75 | $339 |
| McCulloch, K | LA | 12 | 509 | 24.3 | $12,368.70 |
| Mills, J | NY | 4 | 313 | 2.5 | $782.50 |
| Quinn, MJ | NY | 15 | 509 | 0.25 | $127.25 |
| Rado, A | NY | 7 | 313 | 75.5 | $23,631.50 |
| Chowdhury, I | LA | 9 | 452 | 9.25 | $4,181 |
| Kroll, A | NJ | 33 | 614 | 4.6 | $2,824.40 |
| Giblin, V | NJ | 11 | 509 | 52.5 | $26,722.50 |
| Finnell, L | NJ | 3 | 255 | 0.1 | $25.20 |

| | | | | | |
|---|---|---|---|---|---|
| Glancy, L | LA | 19 | 509 | 0.75 | $381.75 |
| Goldberg, M | LA | 11 | 509 | 12.0 | $6,108 |
| MacDiarmid, D | LA | 4 | 313 | 1.2 | $375.60 |
| Murray, B | NY | 17 | 509 | 8.0 | $4,072 |
| Belfi, E | NY | 11 | 509 | 8.5 | $4,326.50 |
| Donders, L | NY | 5 | 313 | 1.0 | $313 |
| Hinton, C | NY | 4 | 313 | 0.5 | $156.50 |
| Patton, A | NY | 4 | 313 | 1.6 | $500.80 |
| Summer Clerks | NY | - | 139 | 6.25 | $868.75 |
| Paralegals (LA) | | - | 139 | 345.45 | $48,017.55 |
| Paralegals (NY) | | - | 139 | 127.25 | $17,687.75 |
| Paralegals (NJ) | | - | 139 | 3.0 | $417 |
| Totals | | | | 2702.9 | $1,254,245 |